## STATE OF OKLAHOMA v. STATE OF TEXAS.

## UNITED STATES, INTERVENER.

IN EQUITY.

No. 20, Original. Argued December 13, 14, 1921.—Decided May 1, 1922.

1. When this court, in an original suit involving title to land claimed by two States against each other and by the United States against both, has appointed a receiver who has possession of the land and of funds derived therefrom, its control over such subject-matter is exclusive and it has ancillary jurisdiction to determine particular claims thereto irrespective of whether, considered apart, they would lie within its original jurisdiction. P. 581.

2. The former decree (252 U. S. 372) having determined the boundary between Oklahoma and Texas to be along the south bank of the Red River, Texas and its grantees and licensees have no proprietary interests in the river bed or in the proceeds of oil and gas taken therefrom. P. 582.

3. Upon the creation of a new State, ownership of the beds of navigable streams within the boundaries passes from the United States to the State in virtue of the constitutional rule of state equality; but not so of the beds of streams not navigable. P. 583.

4. The Treaty of 1819, between the United States and Spain, by declaring that the navigation of the Sabine River to the sea and of the Red and Arkansas Rivers, throughout the extent of the boundary fixed by the treaty, should be common to the inhabitants of both nations, did not impress upon the Red River the legal character of a navigable stream where not navigable in fact. P. 583.

5. Officials of the United States Public Land Survey are not empowered to settle questions of navigability, and navigability in law can not be implied from their action, in meandering a stream

and their failure to extend township and section lines across it. P. 585.

6. The fact that Congress, in permitting construction of bridges over the Red River in Oklahoma, required, out of precaution, that there should be no interference with navigation, does not justify an inference that the river within that State is navigable. P. 585.

7. Navigability in fact is the test of navigability in law; and whether a river is navigable in fact is determined by whether it is used or susceptible of use, in its natural and ordinary condition, as a highway of commerce for the conduct of trade and travel in the modes customary on water. P. 586.

8. In determining navigability, the actual condition of a river as disclosed in recent years must prevail over statements in early publications made upon inadequate data and loosely repeated. P. 586.

9. Any inference of navigability from the appropriation by Congress, and use, of money in an attempt to improve a river, held overcome by the conditions disclosed in the work. P. 590.

10. A river whose characteristics are such that its use for transportation has been and must be exceptional and confined to irregular and short periods of temporary high water, is not navigable. P. 591.

11. A decision of a State Supreme Court holding a river navigable, in a suit between private parties merely, does not bind the United States, and is not persuasive in the absence of a statement of the evidence. P. 591.

12. Upon the evidence in this case, held that no part of the Red River in Oklahoma is navigable. P. 591.

13. The Treaty of October 21, 1867, 15 Stat. 581, 589, reserved for the Kiowa and other Indians a tract described as the territory north of the "middle of the main channel" of Red River; the Act of June 6, 1900, c. 813, § 6, 31 Stat. 676, describing the south boundary in the same way, directed that part of the tract be allotted to the Indians in severalty, part reserved for their grazing uses, part reserved for the future State of Oklahoma, and the rest subjected to certain public land laws; a grazing reserve, so authorized, described in the executive order defining it as bounded south by the "mid-channel" of the river, was subjected by the Act of June 5, 1906, c. 2580, 34 Stat. 213, to further allotments, entries and sales. Held:

(a) That, as the river, opposite the tract, had no permanent channel other than a broad sandy bed extending from one cut bank to the

other, traversed only by shifting ribbons of water in dry seasons, but over which the water was well distributed in times of substantial flow, the medial line of this bed was the boundary of the Reservation and of the pasture reserve. P. 593.

(b) That disposal of parcels on the north bank, under the acts referred to, by allotment in severalty, entry and purchase under the land laws, or grant to Oklahoma for public purposes, carried with it the right to the river bed in front of them out to the medial line but no farther, the bed south of that line remaining the property of the United States. P. 594.

14. When the United States owns the bed of a non-navigable stream and the upland on one or both sides, it is free to retain all or any part of the bed while disposing of the upland. P. 594.

15. If by a treaty or statute or the terms of its patent the United States has shown its intention to restrict its conveyance to the upland, or to that and a part only of the river bed, that intention will be controlling; and, if its intention be not otherwise shown, it will be taken to have assented that its conveyance be construed and given effect in this particular according to the law of the State in which the land lies. P. 594.

16. These same rules apply where the land disposed of is the tribal land of Indians under guardianship. P. 594.

17. Tested by the common-law rule, in force in Oklahoma, conveyances by the United States of lands on a non-navigable stream, according to legal subdivisions established by the survey of the upland and shown on the official plat, carry title to the middle of the stream. P. 595.

18. The common-law rule in this respect is not displaced by state statutes modifying the common-law rule respecting the rights of riparian proprietors in the natural flow of the stream. P. 596.

19. A perfected allotment to an Indian of a tract of riparian land, to be held by the United States in trust for the sole use and benefit of the allottee or his heirs during a stated period and then to be conveyed to him or them, passes the equitable title and beneficial use of all that would have passed under a full patent. P. 596.

20. Tracts surveyed and platted as upland along the north bank of Red River were disposed of according to the survey and plat under the Acts of 1900 and 1906, *supra*, after changes due to floods had converted some into parts of the river bed and others from non-riparian to riparian land. *Held*, that the allottees or vendees of such last-mentioned tracts took title to the middle line of the stream bed where there were no earlier disposals of intervening

tracts in the bed, but that senior disposition of tracts in the bed carried title to that line.  P. 597.

21. The claim of Oklahoma to portions of the bed of Red River based on ownership of riparian lands was not waived by its failure to assert it in its brief and argument wherein it relied upon the alleged navigability of the stream and claimed the entire bed upon that ground.  P. 598.

22. The declaration of Rev. Stats., § 2319, that all valuable mineral deposits in lands belonging to the United States are open to exploration and purchase, must be read in view of its collocation in the Revised Statutes and with the entire statute of which it is a part.  P. 599.

23. This section applies only where the United States has indicated that lands are held for disposal under the land laws, and never where the United States directs that the disposal be only under laws other than the mining laws.  P. 599.

24. The general policy in respect of public lands in Oklahoma has been that the mining laws should not apply to them, and the exceptions to it do not embrace the land in the south half of the bed of Red River within the receivership area in this case.  P. 600.

THE court having decided that the boundary between Oklahoma and Texas is along the south bank of Red River, 256 U. S. 70, 608, the cause was, on June 1, 1921, ordered set down for hearing on special issues touching the ownership of land in the bed of that stream, as between the United States, Oklahoma, and a number of private parties who were allowed to intervene and assert their claims as riparian owners or as claimants under the placer mining laws.  See 256 U. S. 605.  These matters were heard and are disposed of by the following opinion.

Mr. *Frank Dale* and Mr. *Jesse B. Roote* for Burke Divide Oil Company, Consolidated, et al.

Mr. *T. P. Gore,* with whom Mr. *J. I. Howard,* Mr. *A. M. Beets,* Mr. *Nestor Rummons,* Mr. *Garnett Hughes* and Mr. *Jos. H. Aynesworth* were on the briefs, for Melish Consolidated Placer Oil Mining Association.

*Mr. Henry E. Asp,* for the Indian allottees, and, with *Mr. George P. Rowell* and *Mr. Lucien H. Boggs,* for E. Everett Rowell et al.

*Mr. W. A. Ledbetter,* with whom *Mr. H. L. Stuart, Mr. R. R. Bell, Mr. F. W. Fisher* and *Mr. A. E. Pearson* were on the briefs, for A. E. Pearson et al.

*Mr. Solicitor General Beck* and *Mr. W. W. Dyar,* Special Assistant to the Attorney General, with whom *Mr. Assistant Attorney General Riter* and *Mr. John A. Fain,* Special Assistant to the Attorney General, were on the brief, for the United States.

*Mr. George Trice* for D. D. Brunson.

*Mr. S. P. Freeling,* Attorney General of the State of Oklahoma, with whom *Mr. Geo. F. Short, Mr. W. A. Durant* and *Mr. J. L. Carpenter* were on the brief, for the complainant.

*Mr. F. A. Williams* and *Mr. F. Chatterton* filed a brief on behalf of the Pacific-Wyoming Oil Company et al.

*Mr. Jesse B. Roote* and *Mr. Paul M. Clark* filed a brief on behalf of Mark Denson et al.

*Mr. T. P. Gore* and *Mr. J. H. Cline* filed a brief on behalf of Burkburnett Placer Mining & Oil Company; Double Triangle Petroleum Development Association, et al.

MR. JUSTICE VAN DEVANTER delivered the opinion of the court.

This suit in equity was brought in this court by the State of Oklahoma against the State of Texas to settle a controversy between them over their common boundary along the course of the Red River and over the title to the southerly half of the river bed. The State of Texas answered the bill and joined in the prayer that the controversy be decided. Shortly thereafter the United

States, by the court's leave, intervened as a party in interest, and in its bill of intervention set up a claim to the river bed as against both States. Subsequent proceedings resulted in a decree recognizing and declaring that the true state boundary is along the south bank of the river, as claimed by Oklahoma and the United States, and not along the medial line of the stream, as claimed by Texas. 256 U. S. 70, and 608. The decree directed a further hearing to determine what constitutes the south bank, where along that bank the boundary is, and the proper mode of locating it on the ground. That hearing was had last week and disclosed that the parties differ widely as to what constitutes the south bank. A decision on the question will be given after it shall have been fully considered. The southerly cut-bank to which we shall refer presently may or may not be the bank along which the boundary extends. On this we intimate no opinion now.

Our present concern is with proprietary claims to the bed of the river and to the proceeds of oil and gas taken from 43 miles of the southerly half.

After we acquired jurisdiction of the suit it developed that the State of Oklahoma was claiming title to the entire river bed from one bank to the other; that the State of Texas was claiming title to the southerly half; that the United States was disputing the claims of both States and asserting full proprietorship of the southerly half and an interest (because of its relation to Indian allottees) in portions of the northerly half; that a part of the bed, particularly of the southerly half, had been but recently discovered to be underlaid with strata bearing oil and gas and to be of great value by reason thereof; that many persons were proceeding to drill for, extract and appropriate these minerals with uncertain regard for the dispute over the title and for the true ownership; that possession of parts of the bed was being taken and held by intimidation and force; that in suits for injunction the

courts of both States were assuming jurisdiction over the same areas; that armed conflicts between rival aspirants for the oil and gas had been but narrowly averted and still were imminent; that the militia of Texas had been called to support the orders of its courts and an effort was being made to have the militia of Oklahoma called for a like purpose; that these conflicting assertions of jurisdiction and the measures taken to sustain them were detrimental to the public tranquility, were of general concern and were likely to result in great waste of the oil and gas and in their extraction and appropriation to the irreparable injury of the true owner of the area in dispute, and that unless these minerals were secured and conserved by means of wells drilled and operated in that area there was danger that they would be drawn off through wells in adjacent territory pending the solution of the controversy over the state boundary and the title to the river bed.

In these circumstances, on the motion of the United States, fully supported by the State of Oklahoma and expressly approved by the State of Texas to the extent of its proprietary claim, we appointed a receiver to take possession of the part of the river bed between the medial line and a line on the south bank temporarily and provisionally designated, and within defined easterly and westerly limits, and to control or conduct all necessary oil and gas operations therein. As to that area there appeared to be urgent need for such action. The order provided in detail for ascertaining and holding the net proceeds of the oil and gas in such way that they could be awarded and paid to whoever ultimately should be found to be the rightful claimants, and also provided for such interventions in the suit as would permit all possible claims to the property and proceeds in the receiver's possession to be freely and appropriately asserted. 252 U. S. 372.

Numerous parties have since intervened for the purpose of asserting rights to particular tracts in the receiver's possession and are seeking to have the same and the net proceeds of the oil and gas taken therefrom surrendered to them. Many of these claims conflict one with another and all are in conflict with the claims of one or more of the three principal litigants.

Under the Constitution our original jurisdiction extends to suits by one State against another and to suits by the United States against a State.[1] In its first stage this was a suit by one State against another. When the United States intervened it became also a suit by the United States against those States. In its enlarged phase it presents in appropriate form the conflicting claims of the two States and the United States to the river bed and calls for their adjudication. The other claims, being for particular tracts and funds in the receiver's possession and exclusively under our control, are brought before us because no other court lawfully can interfere with or disturb that possession or control. It long has been settled that claims to property or funds of which a court has taken possession and control through a receiver or like officer may be dealt with as ancillary to the suit wherein the possession is taken and the control exercised,—and this although independent suits to enforce the claims could not be entertained in that court.[2]

---

[1] See *United States* v. *Texas,* 143 U. S. 621; *Minnesota* v. *Hitchcock,* 185 U. S. 373, 384–388; *United States* v. *Michigan,* 190 U. S. 379, 396; *Kansas* v. *United States,* 204 U. S. 331, 342.

[2] See *Freeman* v. *Howe,* 24 How. 450; *Minnesota Co.* v. *St. Paul Co.,* 2 Wall. 609, 632; *Stewart* v. *Dunham,* 115 U. S. 61, 64; *Phelps* v. *Oaks,* 117 U. S. 236; *Morgan's Louisiana & Texas R. R. & S. S. Co.* v. *Texas Central Ry. Co.,* 137 U. S. 171, 201; *Compton* v. *Jesup,* 68 Fed. 263; *Blake* v. *Pine Mountain Co.,* 76 Fed. 624; *Central Trust Co.* v. *Carter,* 78 Fed. 225, 233; *Sioux City Terminal Co.* v. *Trust Co.,* 82 Fed. 124, 128; Daniels Ch. Pl. & Pr., 6 Am. ed., pp. *1743–1745; Street's Fed. Eq. Pr., §§ 1229, 1245, 1246, 1364, et seq.

The decree recognizing and declaring that the boundary between the two States is along the south bank of the river, and not along its medial line, means that the entire river bed is within the State of Oklahoma and beyond the reach of the laws of the State of Texas, and therefore that the latter State and its grantees and licensees have no proprietary interest in the bed or in the proceeds of oil and gas taken therefrom. Of course, when the exact location of the boundary along the south bank is determined, it may develop that the receiver is holding some land on the southerly side of that line or proceeds arising therefrom, and, if so, the State of Texas and its grantees and licensees will be free to claim the same.

The other claims are all such as may be examined without awaiting an exact location of the boundary. They may be grouped and designated as (a) those of the State of Oklahoma and its grantees and licensees, (b) that of the United States, (c) those of Indian allottees and others based on the ownership of riparian lands on the northerly side of the river, and (d) those based on placer mining locations made in the river bed. The evidence bearing on these claims was taken and reported under an order entered at the last term, 256 U. S. 605, and the pertinent questions of fact and law have been recently presented in both oral and printed arguments.

The Red River rises in the Panhandle of Texas, near the New Mexico boundary, and takes an easterly and southeasterly course to the Mississippi, of which it is a tributary. Its total length is about 1,300 miles. The first 557 miles from its mouth are in Louisiana and Arkansas, the next 539 miles are in Oklahoma along the southern boundary, and the remainder is in the Panhandle of Texas. The receivership area embraces 43 miles of the southerly half of the river bed and lies 409 miles up stream from the eastern boundary of Oklahoma. In that State the river bed between the cut-banks, so-called, has

an average width of one-third of a mile,—the least width being in the vicinity of the 100th meridian and the greatest in the vicinity of the receivership area.

By the Treaty of 1803 with France and that of 1819 with Spain the United States acquired the full title to the bed of the river within what now constitutes the State of Oklahoma and to the adjacent lands on the north, and it still is their proprietor, save as in the meantime the title to particular areas, or some beneficial interest therein, has passed or been transferred from it to others in virtue of the Constitution or some treaty or law made thereunder. Recognizing that this is so, the claimants, other than the United States, severally have assumed, as they should, the burden of showing that the rights in the river bed which they are asserting were mediately or immediately derived from the United States. Whether they have successfully carried this burden is the matter for decision.

Oklahoma claims complete ownership of the entire bed of the river within that State, and in support of its claim contends that the river throughout its course in the State is navigable, and therefore that on the admission of the State into the Union, on November 16, 1907, the title to the river bed passed from the United States to the State in virtue of the constitutional rule of equality among the States whereby each new State becomes, as was each of the original States, the owner of the soil underlying the navigable waters within its borders. If that section of the river be navigable, its bed undoubtedly became the property of the State under that rule.[1] Those who oppose the State's claim recognize that this is so; and the State concedes that its claim is not tenable, if that section of the river be not navigable. So the real question in this connection is whether the river is navigable in Oklahoma.

The State relies on the third article of the Treaty of 1819 between the United States and Spain (8 Stat. 252)

---

[1] *Scott* v. *Lattig*, 227 U. S. 229, 242–243, and cases cited.

as conclusively establishing the navigability of that section of the river. The article says:

"The boundary line between the two countries, west of the Mississippi, shall begin on the Gulph of Mexico, at the mouth of the river Sabine, in the sea, continuing north, along the western bank of that river, to the 32d degree of latitude; thence, by a line due north, to the degree of latitude where it strikes the Rio Roxo of Nachitoches, or *Red River;* then following the course of the Rio Roxo westward, to the degree of longitude 100 west from London and 23 from Washington; then, crossing the said Red River, and running thence, by a line due north, to the river Arkansas; thence, following the course of the southern bank of the Arkansas, to its source, in latitude 42 north; and thence, by that parallel of latitude, to the South Sea. The whole being as laid down in Melish's map of the United States, published in Philadelphia, improved to the first of January, 1818. But, if the source of the Arkansas river shall be found to fall north or south of latitude 42, then the line shall run from the said source due south or north, as the case may be, till it meets the said parallel of latitude 42, and thence, along the said parallel, to the South Sea: All the islands in the Sabine, and the said Red and Arkansas rivers, throughout the course thus described, to belong to the United States; but the use of the waters, and the navigation of the Sabine to the sea, and of the said rivers Roxo and Arkansas, throughout the extent of the said boundary, on their respective banks, shall be common to the respective inhabitants of both nations."

The State's reliance is on the concluding words, but we think it ill-founded. At the date of the treaty the Red and Arkansas rivers were in a general way known to be navigable in their lower reaches and not navigable in their upper reaches, but how far up the streams navigability extended was not known. Both were of great length,

largely within a region occupied by wild Indians, and measurably unexplored. The words on which the State relies evidently were to apply alike to both streams. The international boundary was to run along the southerly banks of both,—along that of the Red for about 600 miles[1] east of the 100th meridian and along that of the Arkansas from the same meridian to the source of that river in the heart of the Rocky Mountains. To attribute to the parties a purpose to impress this entire stretch of the Arkansas with a navigable character, regardless of the actual conditions, is, in our opinion, quite inadmissible. And so of the 600-mile stretch of the Red. The entire article, examined in the light of the circumstances in which the treaty was negotiated, shows, as we think, that what really was intended in this regard was to provide and make sure that the right to navigate these rivers, wherever along the boundary they were navigable in fact, should be common to the respective inhabitants of both nations.

A legal inference of navigability is said to arise from the action of the surveying officers who, when surveying the lands in that region, ran a meander line along the northerly bank and did not extend the township and section lines across the river. But this has little significance. The same thing was done on the Platte and other large western streams known to be unnavigable. Besides, those officers were not clothed with power to settle questions of navigability.[2]

A like inference is sought to be drawn from the fact that Congress, in permitting the construction of certain bridges across the river within Oklahoma, provided in sub-

---

[1] The actual length of the international boundary along the south bank of the Red River was 587 miles. Of that boundary 48 miles are now in the Arkansas-Texas boundary and 539 miles are in the Texas-Oklahoma boundary.

[2] *Barden* v. *Northern Pacific R. R. Co.,* 154 U. S. 288, 320; *Gauthier* v. *Morrison,* 232 U. S. 452, 458; *Harrison* v. *Fite,* 148 Fed. 781, 784.

stance that there should be no interference with navigation.[1] But it is reasonably manifest that this provision was only precautionary and not intended als an affirmation of navigable capacity in that locality. The river was known to be navigable from its mouth to near the eastern boundary of Oklahoma and there had been, as will be seen presently, some light navigation above that boundary in the irregular times of temporary high water; so those who were about to construct the bridges at large expense deemed it prudent to secure the permission of Congress, and Congress merely took the perfectly safe course of qualifying its permission as indicated.

We find nothing in any of the matters relied on which takes the river in Oklahoma out of the settled rule in this country that navigability in fact is the test of navigability in law, and that whether a river is navigable in fact is to be determined by inquiring whether it is used, or is susceptible of being used, in its natural and ordinary condition as a highway for commerce, over which trade and travel are or may be conducted in the customary modes of trade and travel on water.[2]

The evidence bearing on this question is voluminous and in some respects conflicting. A large part of it deals directly with the physical characteristics of the river, comes from informed sources and is well in point. A small part consists of statements found in early publications, and repeated in some later ones, to the effect that the river is navigable for great distances,—some of them exceeding its entire length. These statements originated

---

· [1] Examples of this are found in the Acts of May 15, 1886, c. 332, 24 Stat. 28; May 17, 1886, c. 354, 24 Stat. 63, and June 30, 1916, c. 200, 39 Stat. 251.

[2] *The Daniel Ball*, 10 Wall. 557, 563; *The Montello*, 20 Wall. 430, 439; *United States* v. *Rio Grande Co.*, 174 U. S. 690, 698; *United States* v. *Cress*, 243 U. S. 316, 323; *Economy Light & Power Co.* v. *United States*, 256 U. S. 113, 121.

at a time when there were no reliable data on the subject, and were subsequently accepted and repeated without much concern for their accuracy. Of course, they and their repetition must yield to the actual situation as learned in recent years.[1] The evidence also discloses an occasional tendency to emphasize the exceptional conditions in times of temporary high water and to disregard the ordinary conditions prevailing throughout the greater part of the year. With this explanatory comment, we turn to the facts which we think the evidence establishes when it is all duly considered.

The river has its source in the Staked Plains of northwestern Texas and from there until it gets well into Oklahoma is within a region where the rainfall is light, is confined to a relatively short period in each year and quickly finds its way into the river. Because of this the river in the western half of the State does not have a continuous or dependable volume of water. It has a fall of three feet or more per mile and for long intervals the greater part of its extensive bed is dry sand interspersed with irregular ribbons of shallow water and occasional deeper pools. Only for short intervals, when the rainfall is running off, are the volume and depth of the water such that even very small boats could be operated therein. During these rises the water is swift and turbulent and in rare instances overflows the adjacent land. The rises usually last from one to seven days and in the aggregate seldom cover as much as forty days in a year.

In 1910 Captain A. E. Waldron, of the Corps of Engineers, made an examination of this part of the river from the mouth of the Big Wichita eastward to the mouth of the Washita (185½ miles) pursuant to a congressional direction. From his report,[2] fairly portraying the normal

---

[1] *Missouri* v. *Kentucky,* 11 Wall. 395, 410.

[2] House Doc., No. 193, 63d Cong., 1st sess., p. 4.

condition of that stretch of the stream, we extract the following:

" 5. The banks of the river are from one-fourth to 1½ miles in width [apart], and from 10 to 30 feet in height, with numerous high, rocky, and clayey bluffs. In the bends of the river the banks cave badly except where the rocky and clayey bluffs occur. This caving causes a continual shifting of the river bed, which moves from one side of the valley to the other.

" 6. In places the channel is 1,000 feet wide, and has a depth of only about one-third of a foot. At other places, notably in the bends, it narrows down to a width of 30 feet with an increased depth.

" 7. The examination of the river was made from a flat bottom bateau drawing 5½ inches when loaded. There was not a single day during the field examination upon which it was not necessary to remove part of the load and drag the boat over sand bars from 300 to 1,000 feet in length. On some days this would occur very often.

" 8. The field work of examination was performed during the period from November 21 to December 19, 1910. During this period the river gauge at Denison, 11 miles below the mouth of the Washita River, ranged between zero and 1 foot. In reference to the gauge readings at the bridge near Denison, it might be well to state that there were only 42 days during the year 1910 on which this gauge read 2 feet or over, and only 81 days on which it read as much as 1 foot or over.

" 9. At three places during the trip down the river in the bateau, solid rock bottom was encountered, ranging from 300 to 1,200 feet in length, and having a depth of only four-tenths of a foot of water in the deepest place."

We regard it as obvious that in the western half of the State the river is not susceptible of being used in its natural and ordinary condition as a highway for commerce; and there is no evidence that in fact it ever was so used. That section embraces the receivership area.

· Of. course, the conditions along that part of the river greatly affect the part in the eastern half of the State. But the latter receives additional waters from the Washita and other tributaries and has a practically continuous flow of varying volume, the extreme variation between high and low water being about thirty feet. When the water rises it does so very rapidly and it falls in the same way. The river bed has a fall of more than one foot to the mile and consists of light sand which is easily washed about and is carried down stream in great quantities at every rise of the water. At all times there is an almost continuous succession of shifting and extensive sand bars. Ordinarily the depth of water over the sand bars is from six to eighteen inches and elsewhere from three to six feet. There is no permanent or stable channel. Such. as there is shifts irregularly from one side of the bed to the other and not infrequently separates into two or three parts. Boats with a sufficient draft to be of any service can ascend. and descend only during periods of high water. These periods are intermittent, of irregular and short duration, and confined to a few months in the year.

· Lanesport, Arkansas, which is near the Oklahoma boundary, has been the usual head of navigation; but for several years before railroads were extended into that section boats of light draft carried merchandise up the river to the mouth of the Kiamitia[1] and other points in that vicinity and took out cotton and other products on the return trip. This occurred only in periods of high water, and was accomplished under difficulties. In very exceptional instances boats went to the mouth of the Washita,[2] where some had to await the high water of the next season before they could return. When the railroads

---

[1] The Kiamitia is 83 miles up stream from the eastern boundary of Oklahoma.

[2] The Washita is 217 miles up stream from the eastern boundary of Oklahoma.

were constructed this high-water or flood navigation ceased. That was between 1875 and 1880.

According to many witnesses, whose knowledge of this part of the river reaches back for a long period, the depth of the water at ordinary stages has come to be less than it was from 1850 to 1870, when they first knew it. Portions of the banks have been swept away and sand in great quantities has been brought down stream, making the river wider and shallower than at the time of the navigation just mentioned.

Beginning in 1886 Congress made several appropriations looking to the improvement of the river from a point in Arkansas, not far from the Oklahoma boundary, westward to the mouth of the Washita, and about $500,000 was expended on the project. The officer in charge of the work several times recommended that it be discontinued, because not likely to result in any commercial navigation; and in 1916[1] that officer, the division engineer, the Board of Engineers and the Chief of Engineers concurred in recommending that the project be entirely abandoned, their reasons being that the small (high-water) commerce of an earlier period had disappeared; that the characteristics of the river rendered it impracticable to secure a useful channel except by canalization, the cost of which would be prohibitive; that the expenditures already made were practically useless, and that there was no reason to believe conditions would change in such way as to bring better results in the future. In 1921[2] that recommendation was repeated. No appropriations in furtherance of the project were made after 1916. Any inference of navigable capacity arising from the fact that this project was undertaken is much more than overcome by the actual conditions disclosed in the course of the work.

[1] House Doc., No. 947, 64th Cong., 1st sess.
[2] House Doc., No. 87, 67th Cong., 1st sess.

While the evidence relating to the part of the river in the eastern half of the State is not so conclusive against navigability as that relating to the western section, we think it establishes that trade and travel neither do nor can move over that part of the river, in its natural and ordinary condition, according to the modes of trade and travel customary on water;—in other words, that it is neither used, nor susceptible of being used, in its natural and ordinary condition as a highway for commerce. Its characteristics are such that its use for transportation has been and must be exceptional, and confined to the irregular and short periods of temporary high water. A greater capacity for practical and beneficial use in commerce is essential to establish navigability.[1]

A decision by the Supreme Court of Oklahoma, in *Hale v. Record,* 44 Okla. 803, is relied on as adjudging that the river is navigable in fact. The opinion in the case is briefly to the effect that in the trial court the evidence was conflicting, that the conflict was there resolved on the side of navigability, and that this finding had reasonable support in the evidence and therefore could not be disturbed. It was a purely private litigation. The United States was not a party and is not bound.[2] There is in the opinion no statement of the evidence, so the decision hardly can be regarded as persuasive here.

We conclude that no part of the river within Oklahoma is navigable and therefore that the title to the bed did not pass to the State on its admission into the Union. If the State has a lawful claim to any part of the bed, it is only such as may be incidental to its ownership of riparian

---

[1] *United States* v. *Rio Grande Co.,* 174 U. S. 690, 698–699; *Leovy* v. *United States,* 177 U. S. 621; *Toledo Liberal Shooting Co.* v. *Erie Shooting Club,* 90 Fed. 680, 682; *Harrison* v. *Fite,* 148 Fed. 781, 784; *North American Dredging Co.* v. *Mintzer,* 245 Fed. 297, 300.

[2] *Economy Light & Power Co.* v. *United States,* 256 U. S. 113, 123.

lands on the northerly bank. And so of the grantees and licensees of the State.

The riparian claims pressed on our attention all relate to the river bed between the 98th degree of west longitude and the mouth of the North Fork.[1] They must be considered in the light of matters which we proceed to state.

By a treaty between the United States and the Kiowa, Comanche and Apache tribes of Indians, concluded in 1867, the territory north of the "middle of the main channel" of the Red River and between the 98th meridian and the North Fork was set apart as a reservation and permanent home for those tribes. 15 Stat. 581 and 589. That reservation was maintained until June 6, 1900, when Congress passed an act (c. 813, § 6, 31 Stat. 672, 676) directing that it be disposed of (a) by allotting in severalty to each member of the tribes one hundred and sixty acres; (b) by setting apart 480,000 acres of grazing lands for the common use of the tribes; (c) by reserving four sections in each township for the future State of Oklahoma for school and other public purposes, and (d) by subjecting the remaining lands to particular modes of entry and acquisition under designated land laws. Besides the allotments and grazing reserves, the Indians were to receive stated payments in money. The Indians assailed the validity of the act, but in *Lone Wolf* v. *Hitchcock*, 187 U. S. 553, this court sustained it as a legitimate exertion of the power of Congress over tribal Indians and their property, and the act was carried into effect. Like the treaty reservation, the provisions of the act were in terms limited to the territory north of the "middle of the main channel" of the river.

One of the grazing reserves created under that act contained 400,000 acres, and the order setting it apart made the "mid-channel" of the river its southern boundary.

---

[1] The 98th degree is 380 miles, and the mouth of the North Fork 477 miles, up stream from the eastern Oklahoma boundary.

That reserve came to be known as the Big Pasture and was maintained until June 5, 1906, when Congress passed an ·act (c. 2580, 34 Stat. 213) requiring that it be disposed of (a) by allotting in severalty to each child born into the tribes after the Act of 1900 one hundred and sixty acres, and (b) by subjecting the remaining lands to particular modes of entry and sale and placing the proceeds in the Treasury to the credit of the tribes. Subsequent amendments made some changes, not material here, in the modes of entry and sale, and directed the use of a part of the proceeds in maintaining a hospital which was open to and used by the members of the tribes. The last amendment was made June 30, 1913, c. 4, § 17, 38 Stat. 77, 92.

The lands on the northerly bank of the river between the 98th meridian and the North Fork were all disposed of under the Act of 1900, or that of 1906 and its amendments,—some as Indian allotments, some through entries or purchases in the designated modes, and some under the grant to Oklahoma for school and other public purposes. The riparian claims are all founded on these disposals. The river bed there is from 1500 to 6600 feet wide between what are called the cut-banks.

The receivership area lies immediately south of what was the Big Pasture and has the same easterly and westerly limits.

One of the questions involved in the riparian claims relates to what was intended by the terms "middle of the main channel" and "mid-channel" as used in defining the southerly boundary of the treaty reservation and of the Big Pasture. When applied to navigable streams such terms usually refer to the thread of the navigable current, and, if there be several, to the thread of the one best suited and ordinarily used for navigation.[1] But this

---

[1] *Iowa* v. *Illinois*, 147 U. S. 1.

section of Red River obviously is not navigable. It is
without a continuous or dependable flow, has a relatively
level bed of loose sand over which the water is well dis-
tributed when there is a substantial volume, and has no
channel of any permanence other than that of which this
sand bed is the bottom. The mere ribbons of shallow
water which in relatively dry seasons find their way over
the sand bed, readily and frequently shifting from one
side to the other, cannot be regarded as channels in the
sense intended. Evidently something less transient and
better suited to mark a boundary was in mind. We think
it was the channel extending from one cut-bank to the
other, which carries the water in times of a substantial
flow. That was the only real channel and therefore the
main channel. So its medial line must be what was desig-
nated as the Indian boundary.

Other questions common to all the riparian claims are,
whether the disposal of the lands on the northerly bank
carried with it any right to the river bed in front of them,
and, if so, whether this right extends to the medial line of
the stream or to the Texas boundary along the opposite
bank. On these questions the parties are far apart. The
State of Oklahoma and the placer mining claimants insist
that no right to the river bed passed with the upland; the
United States that such a right did pass, but extends only
to the medial line, and the several riparian claimants that
the right passed and extends to the Texas boundary along
the opposite bank.

Where the United States owns the bed of a non-
navigable stream and the upland on one or both sides, it,
of course, is free when disposing of the upland to retain
all or any part of the river bed; and whether in any par-
ticular instance it has done so is essentially a question of
what it intended. If by a treaty or statute or the terms
of its patent it has shown that it intended to restrict the
conveyance to the upland or to that and a part only of the

river bed, that intention will be controlling;[1] and, if its
intention be not otherwise shown, it will be taken to have
assented that its conveyance should be construed and
given effect in this particular according to the law of the
State in which the land lies.‾ Where it is disposing of
tribal land of Indians under its guardianship the same
rules apply.

What has been 'said concerning the treaty reservation,
the Big Pasture and the Acts of 1900 and 1906 shows that
the United States intended to dispose of the upland and
the northerly half of the river bed, but nothing more. The
southerly half of the bed had not been included in the
reservation or the Big Pasture and was not subjected to
the operation of the Act of 1900 or that of 1906. This
shows that the United States intended to retain that part
of the bed. It follows that, while the disposals under
those acts could extend southward to the medial line, they
could not go beyond it.

In executing the acts there was no attempt to dispose of
the river bed separately from the upland. The disposals
were all according to the legal subdivisions established by
the survey of the upland and shown on the official plat.
In the patents there was no express inclusion or exclusion
of rights in the river bed.

Tested by the common law these conveyances of ripa-
rian tracts conferred a title extending not merely to the
water line, but to the middle of the stream. Possibly, if
the river bed for its entire breadth had been subject to

---

[1] *Wilcox* v. *Jackson*, 13 Pet. 498, 516–517; *Irvine* v. *Marshall*, 20
How. 558; *Gibson* v. *Chouteau*, 13 Wall. 92, 99; *Utah Power & Light
Co.* v. *United States*, 243 U. S. 389, 404; *Kean* v. *Calumet Canal Co.*,
190 U. S. 452, 460.

[2] *Hardin* v. *Jordan*, 140 U. S. 371, 384; *Mitchell* v. *Smale*, 140
U. S. 406, 413–414; *Grand Rapids & Indiana R. R. Co.* v. *Butler*,
159 U. S. 87, 92; *Hardin* v. *Shedd*, 190 U. S. 508, 519; *Whitaker*
v. *McBride*, 197 U. S. 510, 512, 515–516; and see *Railroad Co.* v.
*Schurmeir*, 7 Wall. 272, 287, et seq.

9544°—23——41

disposal under the Acts of 1900 and 1906, the title would have extended to the Texas boundary along the other side; but this is a debatable question which need not be considered here, for no disposal under those acts could go beyond the medial line. That limitation inhered in all that was done.

But it is contended that the common-law rule, although formerly adopted in Oklahoma [1] and recently recognized by the Supreme Court of the State,[2] has been impliedly abrogated by the legislature. The contention is not sustained by any decision in the State and, in our opinion, is not tenable. It is based on statutes displacing or qualifying the common-law rule respecting the rights of riparian proprietors in the natural flow of a stream, which is a matter quite distinct from the ownership of the bed of the stream. The rule as to either could be displaced without affecting the other.

Our conclusion on the general questions is that the disposal of the lands on the northerly bank carried with it a right to the bed of the river as far as, but not beyond, the medial line.

Particular questions relating to some of the riparian claims and not to others are presented, and we now turn to them.

The Indian allotments were made in 1909 and 1910, but have not been carried to final patents. They are evidenced by trust patents, so-called, wherein the United States engages to hold the land for a period of twenty-five years "in trust for the sole use and benefit" of the allottee, or of his heirs in the event of his death, and at the end of the trust period to convey the same to him, or to his heirs if he be not then living. The contention is made that no right to the river bed could pass under these

[1] Rev. Laws Okla., 1910, § 4642.
[2] *Hale* v. *Record*, 44 Okla. 803.

allotments in advance of the issue of the final patent. Even if this were so, it well may be doubted that it would enable strangers to fasten any claim on or appropriate the bed in front of the allotments. But we think it is not so. The allotments when perfected passed the equitable title and beneficial use of all that would have passed under a full patent. The purpose of the holding in trust by the United States is to prevent allottees from improvidently alienating or encumbering the land, not to cut down or postpone their rights in other respects.

The lands along the north bank were surveyed and platted in 1874 and 1875. Afterwards, and before the disposals in question, portions of the bank were swept away in times of flood. This changed the relation to the river of several surveyed tracts. Some became part of the bed and others nonriparian before became riparian. But most of the tracts on which the riparian claims before us are founded remained unchanged and need not be specially noticed.

Of the tracts changed from riparian upland to river bed, a small number were disposed of as if they still were upland abutting on the river,—the disposal occurring while the adjacent land then actually riparian was unallotted and unsold. Evidently the disposal was intended to operate and have effect as if the tracts retained their former relation to the river; and, as nothing stood in the way, we think the title under the disposal reached to the middle of the stream.

Of the tracts which had been nonriparian but became riparian, all were disposed of in ordinary course. Generally the tracts in front of them which came to lie in the river bed were neither allotted nor sold. Where this was so, we think the right to the bed, out to the center line, passed with the tracts which had come to be riparian. But where there was a prior disposal of the tracts in the bed, that right, as just indicated, went with them.

Four legal subdivisions in township five south of range fourteen west were sold to Fred Capshaw and transferred by him to A. E. 'Pearson et al., who are interveners here. Two of these subdivisions, lots 1 and 2 of section 8, were riparian when surveyed, but in the river bed when sold. Another, the N. W. ¼ of the N. W. ¼ of the same section, lay immediately back of these lots. The fourth, the N. E. ¼ of the N. E. ¼ of section 7, lay to one side of the third. At the time of the survey the fourth was separated from the river by a tract which afterwards came to be largely, if not entirely, in the river bed. This tract was sold to Robert L. Owen before the others were sold to Capshaw. Pearson et al. claim the river bed in front of lots 1 and 2 of section 8 and also in front of the N. E. ¼ of the N. E. ¼ of section 7. Their rights are just what Capshaw's were, neither more nor less. We think the bed of the river in front of the two lots in section 8, out to the middle, passed to Capshaw, but that no part of the bed passed to him with the N. E. ¼ of the N. E. ¼ of section 7. All that could possibly have passed with that subdivision had already passed to Owen with the tract which lay in front of it.

The State of Oklahoma in its bill claimed riparian rights in portions of the bed by reason of its ownership of occasional school and other lands on the bank; but in its brief it has endeavored only to sustain the claim based on the asserted navigability of the river. As to the latter it has failed. According to the evidence, it owns riparian lands both within and without what was the Kiowa, Comanche and Apache reservation. As to such lands it is entitled to the same incidents of riparian ownership that any other owner would have. The fact that it has not pressed this right in its brief might be regarded by some as a waiver or renunciation of the right; but this hardly can have been intended. The State's riparian right will therefore be recognized in the decree.

What has been said indicates the disposition which must be made of all the riparian claims. It would serve no purpose to enumerate them here. All will be dealt with in the decree conformably to the views we have expressed.

We come next to the claims founded on placer mining locations. These locations were all made in that part of the southerly half of the river bed which is in front of what was the Big Pasture. It is objected that some are overlapped by others and that some were without a supporting mineral discovery. But we put these questions aside and come directly to one which is common to all the locations, namely, whether that part of the bed was subject to location and acquisition under the mining laws. The placer claimants insist that it was and the United States that it was not. No one doubts that when these locations were made lands valuable for oil, if within areas where the mining laws were operative, could be located and acquired as placer claims.

The claimants rely on § 2319 of the Revised Statutes, which declares:

" All valuable mineral deposits in lands belonging to the United States, both surveyed and unsurveyed, are hereby declared to be free and open to exploration and purchase, and the lands in which they are found to occupation and purchase, by citizens of the United States and those who have declared their intention to become such, under regulations prescribed by law, and according to the local customs or rules of miners in the several mining districts, so far as the same are applicable and not inconsistent with the laws of the United States."

This section is not as comprehensive as its words separately considered suggest. It is part of a chapter relating to mineral lands which in turn is part of a title dealing with the survey and disposal of " The Public Lands." To be rightly understood it must be read with due regard

for the entire statute of which it is but a part, and when
this is done it is apparent that, while embracing only lands
owned by the United States, it does not embrace all that
are so owned.    Of course, it has no application to the
grounds about the Capitol in Washington or to the lands
in the National Cemetery at Arlington, no matter what
their mineral value; and yet both belong to the United
States.    And so of the lands in the Yosemite National
Park, the Yellowstone National Park, and the military
reservations throughout the western States.    Only where
the United States has indicated that the lands are held for
disposal under the land laws does the section apply; and
it never applies where the United States directs that the
disposal be only under other laws.

This part of the river bed was for many years in the
Indian Territory, to which none of the land laws ever was
extended.    In 1890 it was made part of the Territory of
Oklahoma by an act wherein Congress expressly indicated
that the lands in that Territory should be disposed of
under the homestead and townsite laws " only." [1]

A question arose under that act as to whether the ex-
clusion of the mining laws relieved homestead applicants
from offering proof that the land sought to be entered
was agricultural and not mineral, such proof being re-
quired where the mining laws were in force; and Congress
promptly answered that question by saying, in an Act of
1891, that " all the lands in Oklahoma are hereby declared
to be agricultural lands, and proof of their non-mineral
character shall not be required as a condition precedent
to final entry." [2]    In the many acts which followed
wherein lands in Oklahoma were opened to disposal all
but two exactly conformed to the policy announced in

---

[1] Act May 2, 1890, c. 182, §§ 1, 18, 20, 22, 26 Stat. 81.

[2] Act March 3, 1891, § 16, c. 543, 26 Stat. 989. 1026.

the Acts of 1890 and 1891. The two exceptional acts were one of 1895 dealing with the Wichita lands [1] and the one of 1900, before described, dealing with the Kiowa, Comanche and Apache lands.[2] The Act of 1895 expressly extended the mining laws over the limited area to which it related, which was remote from the one with which we are here concerned. The Act of 1900 expressly extended the mining laws to a part, but not all, of the lands to which it related,—that is to say, it extended them to such lands as were to be allotted and opened to settlement, but not to those set apart as grazing reserves. There never was any act subjecting the latter to the operation of the mining laws. On the contrary, the Act of 1906 and its amendments show that the Big Pasture and other grazing reserves were to be disposed of only in other modes specially defined.

Thus the general policy in respect of lands in Oklahoma has been that the mining laws should not apply to them, and to this there have been but two exceptions, each confined to a limited area and neither embracing the locality in question. Even the words of the exceptions, " are hereby extended over " the particular areas, plainly imply that but for them the mining laws would not have applied to those areas. The general policy is also reflected in the Act of 1906, providing for Oklahoma's admission into the Union, the eighth section of which distinctly recognized the right of the State to receive mineral lands under the grants to it for school and other purposes,[3]—a thing not permitted to a State where the mining laws are in force.[4]

This is the view which has been uniformly taken and enforced by the officers of the land department in the

---

[1] Act March 2, 1895, c. 188, 28 Stat. 876, 899.

[2] Act June 6, 1900, c. 813, 31 Stat. 672, 676–681

[3] Act June 16, 1906, c. 3335, § 8, 34 Stat. 267.

[4] *United States* v. *Sweet*, 245 U. S. 563.

administration of these acts.[1]  Those officers have not recognized or given any effect to these mining ·claims.

We conclude that this part of the river bed never was subject to location or acquisition under the mining laws,— nor, indeed, to acquisition under any of the land laws,— and therefore that these locations were of no effect and conferred no rights on the locators or their assigns.

The parties in interest will be accorded twenty days within which to submit a proper form of decree disposing of the several claims now before us in conformity with the views expressed in this opinion.

*It is so ordered.*

---

[1]*Acme Cement and Plaster Co.*, 31 L. D. 125; Instructions, 31 L. D. 154; *E. A. Shirley,* 35 L. D. 113; Regulations, § 38, 35 L. D. 239; *Benjamin F. Robinson,* 35 L. D. 421; *Lenertz* v. *Malloy,* 36 L. D. 170; *Knight Placer Mining Assn.* v. *Hardin,* 47 L. D. 331.