## BURKE–DIVIDE OIL CO. v. NEAL.

### No. 5183.

Circuit Court of Appeals, Seventh Circuit.

Nov. 10, 1934.

Rehearing Denied Dec. 20, 1934.

John T. Beasley and John H. Beasley, both of Terre Haute, Ind., and Henry M. Ward, of Washington, D. C., for appellant.

Val Nolan, U. S. Atty., of Indianapolis, Ind., Frank J. Wideman, Asst. Atty. Gen., Sewall Key and Erwin N. Griswold, Sp. Assts. to Atty. Gen., and Robert N. Anderson, of Washington, D. C., for appellee.

Before ALSCHULER, SPARKS, and FITZHENRY, Circuit Judges.

ALSCHULER, Circuit Judge.

The appeal is from a judgment denying appellant's demand for the recovery of $74,-434.82, which it had paid under protest to the collector of internal revenue pursuant to a redetermination by the Commissioner of Internal Revenue of appellant's income tax for the calendar year 1926. Jury was waived, and the facts are all stipulated.

The sole question in the case is whether certain payments made to appellant by the Secretary of the Interior during the year 1926 were "gross income" to appellant under section 213 (a) of the Revenue Act of 1926 (26 USCA § 954 (a), or are to be regarded as a gift by the United States to the taxpayer, which, under section 213 (b) of the same act (26 USCA § 954 (b), would be excluded from "gross income."

It appears that in the years 1918 and 1919 appellant (which term as here employed refers as well to appellant's predecessors in interest, to whose rights appellant has concededly succeeded) located certain claims for oil and gas in the bed of the Red river, assumed to be the boundary line between the states of Texas and Oklahoma. The locations were concededly made in good faith, on the assumption that they were in compliance with the mining laws of the United States and upon lands of the United States which were subject to such location. Appellant expended not less than $107,000 in development work upon the claims.

Contention arose between the states of Texas and Oklahoma as to which of these states included in its borders the disputed area upon which these mining claims, as well as others, had been located. Texas, which, unlike other states, held title to the public lands within its borders, claimed title to this area, and interfered with the work on these locations. Physical conflict between the authorities of the two states was threatened, when Oklahoma applied to the United States Supreme Court to take jurisdiction of and settle the boundary dispute. The Supreme Court took jurisdiction and appointed a receiver for all the lands in question, and the improvements thereon. The receiver took possession and under direction of the court operated the property, producing and disposing of the oil and gas therefrom—not only from wells which had been started by the locators, but also from wells drilled by the receiver upon these locations.

The United States, contending that it had title to the area, and that the locations thereon were unauthorized and void, filed its petition for intervention, which the court allowed. The locators of claims in the area, including appellant, also filed petitions to intervene, asserting their title to their respective locations, and were admitted as parties to the suit.

On May 1, 1922, the court decided that the area in question belonged to the United States, and that these locations were unau-

thorized by any law of the United States and conferred no lawful rights on the several locators, and that the locations were void; and decree was entered accordingly. State of Oklahoma v. State of Texas, 258 U. S. 574, pages 582, 599–602, 42 S. Ct. 406, 66 L. Ed. 771.

The operation of the property by the receiver had resulted in the accumulation of income aggregating upwards of $5,000,000, which had been impounded by order of the court awaiting the outcome of the litigation and the order of the Supreme Court for disposition of the impounded fund. After this decision of the Supreme Court, Congress passed the Act of March 4, 1923 (30 USCA § 230 et seq.). Section 1[1] of the act (30 USCA § 230) authorizes the Secretary of the Interior to adjust the "equitable claims" of those who in good faith prior to February 25, 1920, had made locations upon these lands in an effort to develop oil or gas, by issuing permits or leases to those found equitably entitled thereto.

In other sections of the act terms of such leases are set forth and provisions made for the granting of permits and leases upon these lands, and the disposition of the impounded fund resulting from the receiver's operation of the properties. Various deductions therefrom are provided for, including 12½ per cent. as royalty to the United States; and it was specified that "the balance after deducting the expense of collection shall be paid over to the person or persons awarded permits or leases under this Act, as their interests may appear." Section 4 (30 USCA § 233).

Section 6 of the act (30 USCA § 235) specifies that the Supreme Court is authorized, on termination of the receivership, to direct the receiver to pay to the Secretary of the Interior the impounded fund, and that when the fund shall have been paid to the Secretary of the Interior it shall be by him administered and disbursed as in the act provided. The Secretary was authorized by section 7 (30 USCA § 236) to prescribe the necessary rules and regulations and to do all things necessary to carry out the purpose of the act.

After the act was passed, and in pursuance of it, appellant made application for permits and leases thereunder of the lands whereon its locations had previously been made. The Secretary of the Interior held hearings and decided that appellant had equitable claim to the lands and oil and gas deposits for which its application had been made; and in 1925 he granted appellant a permit to prospect on these lands for oil and gas. Later, in pursuance of the terms of the Act of March 4, 1923, and the regulations promulgated thereunder, the Secretary leased to appellant the lands it had located.

On April 19, 1926, the Secretary of the Interior, acting under the authority of the Act of March 4, 1923, paid over to appellant the sum of $762,320.37, as the share of the receiver's operating income attributable to the properties whereon appellant's locations had been made, less receivership and other authorized expense, including 12½ per cent. royalty to the United States.

There is no conflict, as appellant seems to contend, between the decision of the Supreme Court and the Act of March 4, 1923. When the court decided that the lands and the income therefrom belonged to the United States, the power of disposal over the lands and the proceeds was with the United States through the Congress; and the Supreme Court, in compliance with the Act of Congress of March 4, 1923, passed to that end, ordered the receiver to turn the fund over to the Secretary of the Interior, which was done.

The transaction between appellant and the United States, through its Secretary of the Interior, involved not merely the turning over of this sum of money to appellant. The payment of the money was but one feature of the transaction. Had the leases not been made to appellant the funds would not have been paid to it; but since the act provides that the money may be paid over only to those who established equitable claims to the lands, and to whom the leases were ac-

[1] "Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled, That the Secretary of the Interior is hereby authorized to adjust and determine the equitable claims of citizens of the United States, and domestic corporations to lands and oil and gas deposits belonging to the United States and situated south of the medial line of the main channel of Red River, Oklahoma, which lands were claimed and possessed in good faith by such citizens or corporations, or their predecessors in interest, prior to February 25, 1920, and upon which lands expenditures were made in good faith and with reasonable diligence in an effort to discover or develop oil or gas, by issuance of permits or leases to those found equitably entitled thereto." 42 Stat. 1448.

cordingly made, such lessees could not be other than persons who, like appellant, had in good faith located and worked the claims in the search for and production of oil and gas. The terms upon which the new leases might be granted were such as were within the limitations prescribed by the act and approved by the Secretary of the Interior. They included an undertaking to operate, and continue to operate, the properties, and to pay the United States royalty of 12½ per cent. upon the production. The act provides that the impounded fund be paid only to those found equitably entitled to receive the permits or leases, and who would accept and enter into them.

We read in this transaction mutual undertakings of the parties from which it cannot be concluded that the payment of the money was wholly without any consideration to the United States, and merely by way of gratuity or gift to the ultimate recipients of the fund. Whether or not the United States might have made more profitable disposition of the lands and the fund is here of no materiality.

Our attention has been directed to a number of adjudications wherein there was involved the taxability of funds which were awarded by the Government, but in none of them was there involved a situation comparable with that here.[2] In appellant's supplemental reply brief it is well stated: "In some of its controlling characteristics, the case is unique. * * * The 1923 Act is itself unique in the sense that the history of the subject matter of the Act is unique." The situation is indeed unique, and is quite without precedent.

Had the revenue arising from operation of these locations been received by appellant during the time it possessed and operated them, unquestionably such revenue would have been includable in its taxable gross income. We think it was none the less so includable if, as was here the case, it reached the taxpayer indirectly through being first impounded in the registry of the court and later turned over by the court to the representative of the United States, who, under proper authority, and recognizing appellant's equitable claim to the fund, paid it over to appellant as and for its own.

To qualify itself under the statute for taking the lease and receiving the money, appellant asserted and maintained its equitable right thereto; but now that the money has been safely secured, its inclusion in taxable income is resisted on the ground that it was purely a gift from the United States to appellant. Surely appellant cannot well complain if this incompatible contention does not meet with the concurrence of the Government or the courts.

The judgment is affirmed.

---

[2] In Texas & Pac. R. Co. v. United States, 286 U. S. 285, 52 S. Ct. 528, 76 L. Ed. 1108, the Director General of Railroads had guaranteed to the railroad company, under an act of Congress, compensation while it was under federal control, and an operating income for the six months ensuing at the termination of that control. The decision pointed out that the purpose of the compensation was to overcome the handicap resulting to the railroad from federal control, and to give the railroad time in which to adjust its rates, etc., to meet the changed conditions after federal control. This payment the court held to be income, and taxable, as much as was income from fares and other charges of the railroad. Continental Tie & Lumber Co. v. United States, 286 U. S. 290, 52 S. Ct. 529, 76 L. Ed. 1111, involved a claim made by appellant company in behalf of a railroad that had not been under federal control, but which was guaranteed compensation, by the act of Congress, during federal control because of the unfair competition of the controlled railroads, which was to the disadvantage of those not controlled. This payment was held to be taxable income upon the same principles as stated in the decision in the Texas case. In Edwards v. Cuba R. Co., 268 U. S. 628, 45 S. Ct. 614, 69 L. Ed. 1124, the President of Cuba had made a contract with the railroad for it to construct and operate a railway in that republic, pursuant to which contract the Cuban government, by act of Congress, was to make, and did make, payments to the railroad. This was held not to be income, but payment to encourage the company to build the railway. In Chicago & Northwestern R. Co. v. Commissioner, 66 F.(2d) 61 (C. C. A. 7), the payment to the railroad by the Government was for undermaintenance during federal control, and was held by this court to have been restitution of capital to the railroad, and not taxable income.