BOARD OF HUDSON RIVER REGULATING DISTRICT, Respondent, *v.* FONDA, JOHNSTOWN AND GLOVERSVILLE RAILROAD COMPANY and Another, Appellants.*

Third Department, April 5, 1928.

Eminent domain — public use — regulation of flow of Hudson river by storage reservoirs, under Conservation Law, art. 7-A, is public use — taking of part of short line of railroad not violation of Interstate Commerce Clause of Federal Constitution — Federal. Transportation Act of 1920 not applicable.

This is a proceeding to condemn about six and one-half miles of railroad property including land, rails and structures. The plaintiff is a public corporation created and organized under article 7-A of the Conservation Law for the purpose of establishing reservoirs in the drainage area of the Hudson river and thereby regulating the flow of the river. As an incident the statute authorizes the use of the stored waters for power purposes. The statute itself declares that the primary purpose to be served is to secure the public welfare, including public health and safety, and the evidence shows that during flood conditions in the past there has been a great loss of property along the Hudson river and also epidemics of disease caused by the high waters and that during the dry season the low water has created a situation detrimental to the health of the people.

Clearly the purpose for which the property is to be used is a public use and the mere fact that individuals may benefit privately by the use of the power developed and that private interests have been active in promoting the establishment of the district does not show that the primary purpose is not a public use.

---

* See 127 Misc. 866.— [REP.

The statute is not a direct interference with interstate commerce in that it interferes with an interstate railroad. It appears that the railroad is a short line carrying very little interstate .commerce; that the road itself may be relocated not more than one and one-half miles from the present location and will then serve the same territory as before and that the condemnation commissioners in fixing the amount of the award considered as one of the elements of damage the cost of relocating the line of the railroad and constructing the necessary buildings to make the line effective. Whatever interference there may be with interstate commerce is incidental and not direct, and is not repugnant to the Interstate Commerce Clause of the Federal Constitution.

The Congress has not legislated in reference to the change or relocation of the defendant's railroad line. The Transportation Act of 1920 provides that a railroad shall not extend its line or construct a new line without a certificate that the present or future public convenience and necessity require or will require the construction, or operation, or construction and operation of such additional or extended line of railroad. This act does not apply to the present case where the effect of our statute and the condemnation of the railroad property is merely to require the railroad to relocate its tracks at some distance from its present location. Relocation is neither new construction nor an extension of the old line. Therefore, the railroad company does not need a certificate of convenience and necessity from the Interstate Commerce Commission to relocate its lines.

APPEAL by the defendants from a final order of the Supreme Court, entered in the office of the clerk of the county of Fulton on the 30th day of July, 1927, with notice of intention to bring up for review a judgment entered in said clerk's office on the 14th day of May, 1926.

*Wesley H. Maider*, for the appellant Fonda, Johnstown and Gloversville Railroad Company.

*Hornblower, Miller & Garrison* [*Lindley M. Garrison, Edward C. Bailly, Charles E. Gately* and *F. Law Comstock* of counsel], for the appellant The New York Trust Company.

*Albert Ottinger, Attorney-General* [*Claude T. Dawes, Solicitor-General*, and *John T. Smith, Assistant Attorney-General*, of counsel], on behalf of the constitutionality of article VII-A of the Conservation Law.

*Charles W. Walton* [*Nathan L. Miller* of counsel], for the respondent.

HASBROUCK, J. This case comes under review by an appeal of the defendants from a final order of the court in a condemnation proceeding confirming an award of commissioners appointed to ascertain the damages to be sustained by the defendants because of the taking of their railroad property, viz., about six and one-half miles including land, rails and structures.

There is brought up for review, also, the judgment in the pro-

360 HUDSON RIVER REGULATING DIST. *v.* F., J. & G. R. R. Co.

Third Department, April, 1928. [Vol. 223

ceedings determining the right of the plaintiff to take the property for public use.

The plaintiff is a public corporation created and organized in pursuance of the provisions of the Conservation Law, article VII-A. It was created for the purpose of establishing reservoirs in the drainage areas of the Hudson river and its confluents by which water may be stored in wet seasons and released in dry seasons. The uses contemplated of the stored water are to regulate the flow of streams when required by the public welfare, including public health and safety. (Conservation Law, § 431.)

As an incident the water stored may be used for power purposes "without in any way interfering with the primary purpose of a reservoir constructed under the provisions of this article." (Id. § 430.)

The evidence justified the trial court in finding that the plaintiff had made an effort to agree with the defendants upon compensation to be made for the property proposed to be taken and failed, that notice of the appropriation was served upon the defendant the New York Trust Company, and that the Sacandaga was not navigable water.

Since navigability in fact is the test of navigability in the law discussion of it is unnecessary. (*Oklahoma* v. *Texas*, 258 U. S. 586; *Leovy* v. *U. S.*, 177 id. 621; 2 Cooley Const. Lim. [8th ed.] 1289.)

Whether the primary purpose of the appropriation was to secure the public welfare including public health and safety or for the creation of power for private ends is the outstanding question of fact presented by the record.

The evidence upon the trial of this issue tended to show the results of flood conditions upon the communities, Watervliet, Troy, Rensselaer and Albany. It showed the destruction of property reaching one season the value of over $1,000,000. It showed the onset of pneumonia in habitations rendered untenantable by high water. It showed typhoid fever at Albany because of the overflowing of the filtration plant and that filtration plants become ineffective in times of low water because of the concentration of dangerous germ life in the water.

The defendants urge that it appears from the assessments to be made for the improvement that ninety-five per cent thereof are to be paid by private beneficiaries and that the inference should be drawn that the purpose of the improvement is a private purpose.

That fact scarcely warrants such a conclusion, for the benefits to be secured by the public in public health and safety are not to be measured in dollars and cents. It should lie within the power of the State and become a duty resting upon public officials to

secure benefits for the State at as low a cost as possible.   If it may sell the incidental benefits for enough to pay for the improvement such conduct ought not to weigh against the claim of a public purpose.

Again it is claimed that the kind of reservoir and method of operation show the primary object is power.

The testimony of the experts on sanitary conditions at Albany and in cities along the Hudson immediately above, tends to show that the maintenance of a flow of 4,000 cubic feet in the Hudson during the year and thirteen per cent off the top at flood periods would have a very beneficial influence both in the preservation of property and of the public health.

It does not follow because the point of regulation is located at Spier Falls that the primary purpose of the reservoir is the creation of power for private purposes.   It is quite compatible with the primary purpose that the regulation of flow should be made where incidental private interests may be served.

The defendants' expert witness Lenz swears that if the scientific purpose of the creation of a reservoir at Sacandaga were to provide scientifically for alleviating at Troy and Albany the effects of unusual flood conditions in the Sacandaga the dam and reservoir planned is the scientific way of doing it.

This conclusion is strongly supported by the testimony of the plaintiff's expert witness McCulloh that " the sacrifice, according to these plans, is of power in the interest of a proper regulation of the stream."

The contention of the defendants that the activities of the power beneficiaries in connection with the creation and organization of the plaintiff show that they were responsible for it is no more persuasive than the argument of the defendants regarding the assessment.   The livery of heaven it has been said may be worn to serve the devil in.   The livery of private gain may be useful to serve the public purpose.   No doubt the only purpose entertained by the witnesses West and Bell and by the Indian River Company was for private gain but it was gain anticipated as an incident of regulating the flow for public welfare.

The Regulating Commission ought not to be rebuked but ought to be commended for its levy upon selfishness to serve the greater and the philanthropic purpose of the law.   An examination of the cases cited by the appellants fails to undermine the fact of public welfare found by the trial court.

In the case of *Board of Black River Regulating District* v. *Ogsbury* (203 App. Div. 43; affd., 235 N. Y. 600) Mr. Justice DAVIS, then of the Fourth Department, now of this Department, among other

things, speaking of the right of the plaintiff to take lands for reservoir purposes, wrote: " That right depends upon what the actual purpose is. If for public benefit, then the right exists; if in aid of private gain, the right cannot legally be conferred. The question will involve an inquiry into particular facts and is determined by the extent of the right by the public to its use and not by the extent to which that right is or may be exercised."

Support may be found for the law thus stated in the case of *Bradley* v. *Degnon Contracting Co.* (224 N. Y. 60). In that case in writing of an appropriation under the Rapid Transit Act (Laws of 1891, chap. 4, § 25, subd. 3, as renum. from § 33 and amd. by Laws of 1909, chap. 498, § 8) for a tramway in Seventy-ninth street in the borough of Brooklyn, city of New York, Judge Collin says of its exclusively private use by the defendant: " The people of the State acquired and held only the easement of a highway or street in the bed of Seventy-ninth street. * * * The character of the use, whether public or private, is determined by the extent of the right by the public to its use, and not by the extent to which that right is or may be exercised. If a person or corporation holds or possesses the use, the public must have the right to demand and compel access to or the enjoyment of it. The motive which led to the creation of the use is immaterial."

In *Matter of Ryers* (72 N. Y. 1) a statute under review which contemplated a private benefit and a public benefit was held valid. The language used by Judge Folger was: " We are not called upon in this case to uphold an act which has for its purpose the benefit of individuals. * * * No action, purporting to be under it, which is shown to have other object than to maintain the public health, can or will be sustained under our present Constitution. * * * That the public purpose may be sought and attained, and private benefit also found, is not improbable. So it is when private property is taken for the public purpose of a railroad, * * * the private interest promoted is said to be incidental."

Wider than the language above used is that of Judge O'Brien in *Matter of Burns* (155 N. Y. 23, 27): " But a statute is not to be condemned on the ground that it originated in private interests and was intended in some degree to subserve private purposes. * * * So long as the use intended is not restricted to private parties or private interests, but is open to the whole public, it is no valid objection to the act that it will benefit one person, or some class of persons, more than others."

Under the act in question we are not left in doubt for it provides that the public welfare shall be the primary purpose. We think

the facts and the law support the finding of the trial court that the purpose of the plaintiff was primarily public.

The principal contention of the appellants whereby the legality of the judgment and final order is challenged, is that " the taking of portions of its railroad and railroad facilities are repugnant to the commerce clause of the Federal Constitution and, therefore, are void."

The law as laid down by the United States Supreme Court after an exhaustive review of the cases has been stated by Mr. Justice HUGHES in the *Minnesota Rate Cases* (230 U. S. 352, 396) and recently reasserted in *Missouri* v. *Kansas Gas Co.* (265 id. 298, 307), as follows: " If a State enactment imposes a direct burden upon interstate commerce, it must fall regardless of Federal legislation. The point of such an objection is not that Congress has acted, but that the State has directly restrained that which in the absence of Federal regulation should be free."

After cataloguing the limitations of the power of a State where interstate commerce is directly involved, the United States Supreme Court has said: " But within these limitations there necessarily remains to the States, until Congress acts, a wide range for the permissible exercise of power appropriate to their territorial jurisdiction although interstate commerce may be affected. It extends to those matters of a local nature as to which it is impossible to derive from the constitutional grant an intention that they should go uncontrolled pending Federal intervention. Thus, there are certain subjects having the most obvious and direct relation to interstate commerce, which nevertheless, with the acquiescence of Congress, have been controlled by State legislation from the foundation of the Government because of the necessity that they should not remain unregulated and that their regulation should be adapted to varying local exigencies; hence, the absence of regulation by Congress in such matters has not imported that there should be no restriction but rather that the States should continue to supply the needed rules until Congress should decide to supersede them. Further, it is competent for a State to govern its internal commerce, to provide local improvements, * * * to adopt protective measures of a reasonable character in the interest of the health, safety, morals and welfare of its people, although interstate commerce may incidentally or indirectly be involved. Our system of government is a practical adjustment by which the National authority as conferred by the Constitution is maintained in its full scope without unnecessary loss of local efficiency." (*Minnesota Rate Cases, supra.*)

The defendants further contend that Congress has legislated

364 Hudson River Regulating Dist. *v.* F., J. & G. R. R. Co.

Third Department, April, 1928. [Vol. 223

upon the subject involved herein in the Transportation Act (§§ 18, 19, 20, 22 of the statute of 1920) (See Fed. Stat. 1920) * and thus has assumed the exclusive and paramount control thereof.

Taking up the first question raised as to whether the act of the State constitutes a direct interference with interstate commerce, it may be said in the first place that the State in the erection of the dam in the Sacandaga river holds no purpose of interfering with interstate commerce. (*Gilman* v. *Philadelphia,* 3 Wall. 713.)

Its purpose as has been pointed out was the preservation and protection of the health of its citizens.

It is made clear by the statute in pursuance of which this action was brought that the court should exercise due care " to do no unnecessary damage to other public utilities, and  *  *  *  not to interfere with their operation and usefulness beyond the actual necessities of the case, due regard being paid to the other public interests involved." (Conservation Law, § 445.)

In the spirit of such law the decision of the court contained the following: *Forty-second.* " That a relocation of and substituted right-of-way for the portion of the right-of-way track, railroad property and facilities of the defendant, the Fonda, Johnstown and Gloversville Railroad Company, sought to be taken by the Board is feasible and practical to be used by said defendant and that such relocation will not prejudice the interests of the communities now served by said railroad."

The only exception taken by the defendants to the above finding is that it is " contrary to and against the weight of the evidence."

The judgment followed this finding laying down a rule of evidence that one of the elements of damage should be the cost and expense of relocating the line and of constructing new facilities and structures to take the place of the line, its facilities and structures as they existed prior to the taking.

This the condemnation commissioners report that they did in making their award. The railroad corporation resolved, reserving its legal rights, to determine and did determine the place of the relocated line.

The appellants in support of the claim that the taking in question amounts to a direct interference with interstate commerce rely upon the case of *Kansas Southern Railway Co.* v. *Kaw Valley*

---

* See Transportation Act of 1920 (41 U. S. Stat. at Large, 477, 478), § 402, adding to Interstate Commerce Act (24 id. 379), § 1, subds. 18, 19, 20, 22. See, also, U. S. Code, tit. 49, § 1, subds. 18, 19, 20, 22; U. S. Comp. Stat. 1923 Supp. § 8563, subds. 18, 19, 20, 22; Fed. Stat. Ann. (2d ed.) 1920 Supp. pp. 98, 99, § 402, subds. 18, 19, 20, 22; Barnes Fed. Code Supp. § 7884, subds. 18, 19, 20, 22.—[Rep.

*District* (233 U. S. 75).   In that case the Supreme Court of Kansas issued peremptory writs requiring the defendants " to clear the channel to specified heights." This was interpreted by the United States Supreme Court, Mr. Justice HOLMES writing the opinion, to be an " out and out order " for the removal of the bridges of the railroad largely engaged in interstate commerce.

The court denied the power of the State to directly interfere with interstate commmerce even though based upon the claim of the exercise of the police power of the State.  Of it Mr. Justice HOLMES wrote: " The decisions also show that a State cannot avoid the operation of this rule by simply invoking the convenient apologetics of the police power."

But the State of New York invoking the police power is acting under a very different set of circumstances.  It is not acting with reference to a great interstate transportation line such as the Kansas Southern cutting off its power to function as an interstate carrier. New York is dealing with a railroad whose interstate commerce is small and negligible when compared with the great stream of such commerce in this country.  The act in any event so far as it affects interstate commerce is not only not direct but incidental. It is incidental too for the reason that the defendant railroad company has the power to relocate its line and that the final order provides the compensation therefor.

The relocation involves at its widest place a shift not in excess of one and a half miles and on an average much less.  It lies with the railroad company to say whether it will relocate its line.  It has the authority of the State behind it to do so.  Congress has not forbidden its relocation.  If the railroad company shall undertake abandonment the railroad will be the only party which can answer the Federal inquiry.  Since under the decree of our court the line is to be relocated and reinstated and interstate commerce served as before the decree taking the land, rails and structures of the defendants shall be put in effect, the inference cannot be avoided that the order of the court not only does not directly interfere with interstate commerce control of the Nation but recognizes such control.  Under such circumstances, there will be no interference at all.  This will be the result when without let or hindrance from any authority the railroad shall have relocated its line.

Let us examine the cases bearing upon the subject of interference.  Since the analogy between interstate commerce carried on navigable waters and that carried on interstate railways cannot be doubted, the principles involved in such carriages are quite the same.

The pioneer case in the realm of Federal law is that of *Willson* v. *Black Bird Creek Marsh Co.* (2 Pet. 245). In that case the Black Bird Creek Marsh Company was authorized by the State to dam a navigable creek "Passing through a deep level marsh adjoining the Delaware, up which the tide flows for some distance * * * by excluding the water from the marsh, and the health of the inhabitants probably improved. Measures calculated to produce these objects, provided they do not come into collision with the powers of the general government, are undoubtedly within those which are reserved to the States. But the measure authorized by this act stops a navigable creek, and must be supposed to abridge the rights of those who have been accustomed to use it. But this abridgement, unless it comes in conflict with the Constitution or a law of the United States, is an affair between the government of Delaware and its citizens, of which this court can take no cognizance. * * * If Congress had passed any act which bore upon the case; any act in execution of the power to regulate commerce, the object of which was to control State legislation over those small navigable creeks into which the tide flows * * * we should feel not much difficulty in saying that a State law coming in conflict with such act would be void. But Congress has passed no such act. The repugnancy of the law of Delaware to the Constitution is placed entirely on its repugnancy to the power to regulate commerce with foreign nations and among the several States; a power which has not been so exercised as to affect the question."

In *Gilman* v. *Philadelphia* (3 Wall. 713) the facts were that the Legislature of Pennsylvania had authorized the construction of a bridge over the Schuylkill river between East and West Philadelphia and it appeared that such a bridge would interfere with the masts of vessels which had heretofore navigated the river " up to the plaintiff's wharf and would largely reduce the income from the property." The court in that case affirmed the dismissal of the complaint on the ground that in the absence of Federal legislation the State had authorized the act. The court said: " We can see no difference in principle between that case [*Black Bird Creek Marsh Co.*] and the one before us. Both streams are affluents of the same larger river. Each is entirely within the State which authorized the obstruction * * *. Blackbird Creek is the less important water, but it had been navigable, and the obstruction was complete. If the Schuylkill is larger and its commerce greater, on the other hand, the obstruction will be only partial and the public convenience, to be promoted, is more imperative. * * * It must not be forgotten that bridges, which are connecting parts

of turnpikes, streets, and railroads, are means of commercial transportation, as well as navigable waters, and that the commerce which passes over a bridge may be much greater than would ever be transported on the water it obstructs.   *   *   *   The defendants are proceeding in no wanton or aggressive spirit.   *   *   *   The river, being wholly within her limits [Pennsylvania], we cannot say the State has exceeded the bounds of her authority.   Until the dormant power of the Constitution is awakened and made effective, by appropriate legislation, the reserved power of the States is plenary, and its exercise in good faith cannot be made the subject of review by this court."

In *Leovy* v. *U. S.* (177 U. S. 621) the court says: " Nor are we disposed to concur in the doubt expressed whether any navigable water wholly within the limits of the State can be closed under the exercise of the police power for any purpose whatever.   Such a doubt might be justified if there was express legislation of the United States forbidding the act proposed   *   *   *.   Hence, the State authorities were left free to act in such a manner as they thought fit to promote the health and prosperity of the people concerned."

In *Manigault* v. *Springs* (199 U. S. 473) the court, after quoting from the *Black Bird Creek Marsh Co.* case, says: " Several subsequent decisions have confirmed the power of the State to deal, in the absence of Congressional legislation, with their rivers, for the purposes of their internal improvement, such as *Withers* v. *Buckley,* 20 How. (U. S.) 84, wherein the right of Mississippi to change the channels or courses of rivers within the State for the purpose of improvement was sustained."   (See, also,   *Escanaba Company* v. *Chicago,* 107 U. S. 678, 687.)

We accept the use of the *Withers* case so approved as aforesaid as particularly pertinent to the circumstances of the case at bar.

In the *Manigault* case the right of the State in the aid of public health, safety and welfare to change the course of a great navigable stream like the Mississippi wholly within the limits of one State is recognized where Congress has not undertaken by legislation to forbid such action on the part of the State.

The inference seems inexorable that there can be no difference in principle involved in changing the channel of a stream from that involved in changing the location of a line of railway providing the change of location of the line of railway within a State has but an incidental effect upon the interstate commerce service of the line affected.   (*Compagnie Francaise, etc.,* v. *Board of Health,* 186 U. S. 380, 391.)

**368** Hudson River Regulating Dist. *v.* F., J. & G. R. R. Co.

Third Department, April, 1928.                    [Vol. 223

In *Gibbons* v. *Ogden* (9 Wheat. 1, 203, 204) Chief Justice Marshall said: Within the State power is " That immense mass of legislation, which embraces everything within the territory of a State, not surrendered to the general government: all which can be most advantageously exercised by the States themselves. Inspection laws, quarantine laws, health laws of every description, as well as laws for regulating the internal commerce of a State, and those which respect turnpike roads, ferries, etc., are component parts of this mass. No direct general power over these objects is granted to Congress; and, consequently, they remain subject to State legislation. If the legislative power of the Union can reach them, it must be for national purposes; it must be where the power is expressly given for a special purpose, or is clearly incidental to some power which is expressly given."

The principle applicable to the case at bar is that where there is an absence of Federal legislation and there is no direct interference with interstate commerce but only an indirect or incidental interference resulting from acts upon the part of the State in aid or protection of the health of its inhabitants, such acts are not repugnant to the Commerce Clause of the Federal Constitution.

Besides the authorities referred to above, on the relation of the police power of the State to the National power of regulating interstate commerce, there is the more recent case of *Erie R. R. Co.* v. *Board of Public Utility Commissioners* (254 U. S. 394, 410, 411). Mr. Justice Holmes, writing for the court, says: " If it reasonably cau be said that safety requires the change it is for them [the States] to say whether they will insist upon it, and neither prospective bankruptcy nor engagement in interstate commerce can take away this fundamental right of the sovereign of the soil. *Denver & Rio Grande R. R. Co.* v. *Denver*, 250 U. S. 241, 246. To engage in interstate commerce the railroad must get on to the land and to get on to it must comply with the conditions imposed by the State for the safety of its citizens. * * * If the burdens imposed are so great that the road cannot be run at a profit it can stop, whatever the misfortunes the stopping may produce. *Brooks-Scanlon Co.* v. *Railroad Commission of Louisiana*, 251 U. S. 396."

We have not chosen to rely upon the statement in this case that the police power (" safety ") is superior to the National right to regulate commerce.

The question involved in the *Erie* case was the power of the State to require the elevation of railroad tracks in the interest of the public safety. If I apprehend the significance of the language it asserts a principle of the right to interfere with interstate commerce wider

than the facts require for the decision of the case and may, therefore, be *obiter*.

We use the reference to discuss the second claim made against the act of the State in taking the railroad property, viz., that Congress has legislated upon the subject.

The *Erie* case was decided on facts existing prior to the legislation by Congress known as the Transportation Act of 1920. (See statutory citations *supra*.)

Writing with reference to the *Erie* case, Chief Justice TAFT said: " The State Supreme Court thus modifies the findings of the Railroad Commission in so far as they sought to tie the validity of its order establishing a union station to its unquestioned police power to regulate grade crossings in the interest of the public safety. We avoid any inquiry how far, if at all, the principle laid down in *Erie R. R.* v. *Board of Public Utility Commrs.*, 254 U. S. 394, is qualified by the provisions of the Transportation Act." (*Railroad Commission* v. *Southern Pacific Co.*, 264 U. S. 331.)

In the *Erie* case, Mr. Justice HOLMES cited in support of his conclusion the case of *Denver & Rio Grande R. R. Co.* v. *Denver* (250 U. S. 241, 246). There is no support for such broad statement of Mr. Justice HOLMES in the *Erie* case, for what was there said by the court was: " The ordinance makes no discrimination against interstate commerce, will not impede its movement in regular course, and will affect it only incidentally and indirectly."

Thus it must be conceded that the *Erie* case is authority rather for the proposition that if Congress has not acted the State may have the reserved power of indirectly or incidentally interfering with interstate commerce.

But has Congress acted on the subject of the power sought to be exercised by the State? It has not been contended that it has sought by legislation to control the flow of unnavigable rivers or navigable ones to preserve and protect the health of the inhabitants of the State either from floods or low waters. The next question is has Congress legislated on the subject of the relocation of part of an interstate line carrying interstate commerce? Such commerce so carried is within the control of Federal legislation and so must be the instrument by which such commerce is carried on. (*Colorado* v. *U. S.*, 271 U. S. 153, 163.)

The Transportation Act (*supra*) relates to new and extended lines; and to abandonment of lines. It reads in part: " No carrier by railroad   *   *   *   shall undertake the extension of its line of railroad, or the construction of a new line of railroad, or shall acquire or operate any line of railroad, or extension thereof,   *   *   *

24

**370** Hudson River Regulating Dist. *v.* F., J. & G. R. R. Co.

Third Department, April, 1928. [Vol. 223

unless and until there shall first have been obtained from the Commission a certificate that the present or future public convenience and necessity require or will require the construction, or operation, or construction and operation, of such additional or extended line of railroad."

Obviously the defendant when it shall relocate its line will not have extended it nor have constructed a new line. It will be the old line in a new place.

No extension of the present line is contemplated, nor the erection of any new line. This appears because the range of the powers of the Interstate Commerce Commission in the premises are statutory and lie within the public need and convenience.

In the relocation it is only sought to serve the same public convenience that existed before the State sought to acquire the property in question.

In our view it was not the intention of Congress to interfere in the management of railroads to control them in the shifting of their lines to obviate or reduce grades or to accommodate themselves to the necessities of a State in providing for water or food for its citizens or for their health and safety. This is not a case where abandonment is involved. Whether abandonment shall take place depends wholly upon the railroad company. If it shall determine to abandon part of its line the company only can make application therefor. The resolution adopted by the defendant's board of directors seems to negative any idea of abandonment.

We are confirmed in these views of the Transportation Act by the opinion of Chief Justice TAFT in *Railroad Commission* v. *Southern Pacific Co. (supra)*: " It may well be that a mere relocation of a main track of an interstate carrier which does not involve a real addition to, or abandonment of, main tracks and terminals, or a substantial change in destination, does not come within the paragraphs 18 to 21. One might, too, readily conceive of railroad crossings or connections of interstate carriers in which the exercise by a State commission of the power to direct the construction of merely local union stations or terminals without extensions of main tracks and substantial capital outlay should be regarded as an ordinary exercise of the police power of the State for the public convenience and would not trench upon the power and supervision of the Interstate Commerce Commission in securing proper regulation of an interchange of interstate traffic or passengers. Only a lawful order of the Interstate Commerce Commission would raise a question of the power of a State commission in such cases, as the proviso of paragraph 17, § 402 of the Transportation Act shows:

" 'That nothing in this Act shall impair or affect the right of a

State, in the exercise of its police power, to require just and reasonable freight and passenger service for intrastate business, except in so far as such requirement is inconsistent with any lawful order of the Commission made under the provisions of this Act.'

" But there is a great difference between such relocation of tracks or local union stations and what is proposed here. The differences are more than that of mere degree; they and their consequences are so marked as to constitute a change in kind."

The foregoing interpretation of the Transportation Act persuades us that the relocation of line in the case at bar is not contemplated by the act, and that the appellant needs no certificate from the Interstate Commerce Commission for an extension or for a new line or for the abandonment of its line lying within the reservoir area. The relocation of the main track by the appellant requires no real addition to or real abandonment of its main tracks or termini and destination and will remain the same as before, the public convenience served will be the same, except the space occupied by the reservoir; and the capital outlay will be nothing for it is covered by the award of the commissioners. The change is one of degree and not of kind.

If there be any interference on the part of the State through its agency, the plaintiff, with interstate commerce by causing the relocation of this small line of railroad carrying a proportionally small amount of interstate commerce, it is only indirect and incidental.

As has been intimated in the opinions of the great judges quoted, the object which should be striven to be attained is the public good.

Does the general welfare of the people of the whole country lie in the protection of the health and lives of the populous communities on the Hudson river commencing at Albany and situated northerly thereof, or in insisting upon the inviolability of the land and structures of the defendants which carry a very limited amount of interstate commerce.

Mr. Justice SWAYNE in the *Gilman Case* (*supra*) in discussing the benefits to other traffic than that carried on the Schuylkill opens a pertinent inquiry.

Is there any comparison to be made in importance between the health and life sought to be protected by the project of the State and that of the small gain which may be secured by the railroad, from its interstate earnings or the very limited interstate commerce service of the public which may be interfered with by the taking? Common sense and a broad and liberal comprehension of the duty of the States and the United States to their citizens require the exercise of the mutual confidence and respect on the part of those

great agencies of the people. There seems no adequate reason now under the circumstances of the case at bar for any departure on the part of the Nation whose paramount power over 'nterstate commerce is beyond question from that liberality of its dispositions which has been exemplified in so many cases.

We find no adequate reason for disturbing the award. The commissioners proceeded upon the approved theory of damages and made 'an award reasonab'y compensatory thereof.

The judgment and final order should be affirmed, with costs.

VAN KIRK, P. J., and HINMAN, J., concur; HILL, J., concurs in the result, with a memorandum in which DAVIS, J., concurs.

HILL, J. (concurring). I concur in the result. Neither the commerce clause of the Federal Constitution nor the Transportation Act of 1920 is in any wise involved. " The power to take private property, contrary to the decision of the owner, for a public use reaches back of all constitutional provisions." (*Matter of City of Rochester* v. *Holden,* 224 N. Y. 386, 392.) " * * * The right of every State to authorize the appropriation of every description of property for a public use is one of those inherent powers which belong to State governments, without which they could not well perform their great functions. It is a power not surrendered to the United States and is untouched by any of the provisions of the Federal Constitution, provided there be due process of law, that is, a law authorizing it, and provision made for compensation. This power extends to tangibles and intangibles alike. A chose in action, a charter, or any kind of contract, are, along with land and movables, within the sweep of this sovereign authority." (*Cincinnati* v. *Louisville & Nashville R. R. Co.,* 223 U. S. 390, 400.) " This right of appropriating private property to a public use is one of the powers vital to the public welfare of every self-governing community." It is a power " incident to sovereignty," which " belongs to every independent government." (Id. 404. See, also, *Pennsylvania Hospital* v. *Philadelphia,* 245 U. S. 20; *Georgia* v. *Chattanooga,* 264 id. 472.)

DAVIS, J., concurs.

Judgment and final order affirmed, with costs.