(Slip Opinion)          OCTOBER TERM, 2009                    1

NOTE: Where it is feasible, a syllabus (headnote) will be released, as is
being done in connection with this case, at the time the opinion is issued.
The syllabus constitutes no part of the opinion of the Court but has been
prepared by the Reporter of Decisions for the convenience of the reader.
See *United States* v. *Detroit Timber & Lumber Co.,* 200 U. S. 321, 337.

# SUPREME COURT OF THE UNITED STATES

Syllabus

## SOUTH CAROLINA *v.* NORTH CAROLINA

### ON EXCEPTIONS TO THE REPORT OF THE SPECIAL MASTER

No. 138, Orig.   Argued October 13, 2009—Decided January 20, 2010

South Carolina brought this original action seeking an equitable appor-
  tionment with North Carolina of the Catawba River's (river) waters.
  The Court referred the matter to a Special Master, together with the
  motions of three nonstate entities—the Catawba River Water Supply
  Project (CRWSP), Duke Energy Carolinas, LLC (Duke Energy), and
  the city of Charlotte, N. C.—seeking leave to intervene as parties.
  South Carolina opposed the motions.  After a hearing, the Special
  Master granted all three motions and, on South Carolina's request,
  memorialized her reasoning in a First Interim Report.  Among other
  things, she recognized that *New Jersey* v. *New York*, 345 U. S. 369,
  373, sets forth the "appropriate" standard for a nonstate entity's in-
  tervention in an original action; looked beyond intervention to origi-
  nal actions in which the Court allowed complaining States to name
  nonstate entities as defendants in order to give that standard con-
  text; "distilled" from the cases a broad rule governing intervention;
  and applied that rule to each of the proposed intervenors.  South
  Carolina presented exceptions.

*Held:* The CRWSP and Duke Energy have satisfied the appropriate
  intervention standard, but Charlotte has not. Pp. 6–18.

  (a) Under *New Jersey* v. *New York,* "[a]n intervenor whose state is
  already a party should have the burden of showing some compelling
  interest in his own right, apart from his interest in a class with all
  other citizens and creatures of the state, which interest is not prop-
  erly represented by the state." 345 U. S.*,* at 373.  That standard ap-
  plies equally well in this case.  Although high, the standard is not in-
  surmountable.  See, *e.g., Oklahoma* v. *Texas*, 258 U. S. 574, 581.  The
  Court declines to adopt the Special Master's proposed intervention
  rule, under which nonstate entities may become parties to original
  disputes in appropriate and compelling circumstances, such as

where, *e.g.,* the nonstate entity is the instrumentality authorized to carry out the wrongful conduct or injury for which the complaining State seeks relief. A compelling reason for allowing citizens to participate in one original action is not necessarily a compelling reason for allowing them to intervene in all original actions. Pp. 6–11.

(b) This Court applies the *New Jersey* v. *New York* standard to the proposed intervenors. Pp. 11–18.

(1) The CRWSP should be allowed to intervene. It is an unusual bistate entity that is jointly owned and regulated by, and supplies water from the river to, North Carolina's Union County and South Carolina's Lancaster County. It has shown a compelling interest in protecting the viability of its operations, which are premised on a fine balance between the joint venture's two participating counties. The stresses this litigation would place on the CRWSP threaten to upset that balance. Moreover, neither State has sufficient interest in maintaining that balance to represent the full scope of the CRWSP's interests. The complaint attributes a portion of the total water transfers alleged to have harmed South Carolina to the CRWSP, but North Carolina cannot represent the joint venture's interests, since it will likely respond to the complaint's demand for a greater share of the river's water by taking the position that downstream users—such as Lancaster County—should receive less water. See, *e.g., Colorado* v. *New Mexico*, 459 U. S. 176, 186–187. Any disruption to the CRWSP's operations would increase—not lessen—the difficulty of achieving a "just and equitable" allocation in this dispute. See *Nebraska* v. *Wyoming*, 325 U. S. 589, 618. Pp. 11–14.

(2) Duke Energy should also be permitted to intervene. It has carried its burden of showing unique and compelling interests: It operates 11 dams and reservoirs in both States that generate electricity for the region and control the river's flow; holds a 50-year federal license governing its hydroelectric power operations; and is the entity that orchestrated a multistakeholder negotiation process culminating in a Comprehensive Relicensing Agreement (CRA), signed by 70 entities from both States, which sets the terms under which Duke Energy has applied to renew its license. These interests will be relevant to the Court's ultimate decision, since it is likely that any equitable apportionment of the river will need to take into account the amount of water that Duke Energy needs to sustain its operations. And, there is no other similarly situated entity on the river, setting Duke's interests apart from the class of all other citizens of the States. Just as important, Duke Energy has a unique and compelling interest in protecting the terms of its license and as the entity that orchestrated the CRA, which represents a consensus regarding the appropriate minimum continuous flow of river water into South Carolina under a va-

Syllabus

riety of natural conditions and the conservation measures to be taken during droughts. Moreover, neither State is situated to properly represent Duke Energy's compelling interests. Neither has signed the CRA or expressed an intention to defend its terms, and, in fact, North Carolina intends to seek its modification. Pp. 14–16.

(3) However, because Charlotte's interest is not sufficiently unique and will be properly represented by North Carolina, the city's intervention is not required. Charlotte is a North Carolina municipality, and for purposes of this litigation, its water transfers from the river basin constitute part of that State's equitable share. While the complaint names Charlotte as an entity authorized by North Carolina to carry out a large water transfer from the river basin, the complaint does not seek relief against Charlotte directly, but, rather, seeks relief against all North Carolina-authorized water transfers in excess of that State's equitable share. Charlotte, therefore, occupies a class of affected North Carolina water users, and the magnitude of its authorized transfer does not distinguish it in kind from other class members. Nor does Charlotte represent interstate interests that fall on both sides of this dispute, as does the CRWSP. Pp. 16–18.

Exceptions to Special Master's First Interim Report overruled in part and sustained in part.

ALITO, J., delivered the opinion of the Court, in which STEVENS, SCALIA, KENNEDY, and BREYER, JJ., joined. ROBERTS, C. J., filed an opinion concurring in the judgment in part and dissenting in part, in which THOMAS, GINSBURG, and SOTOMAYOR, JJ., joined.

NOTICE: This opinion is subject to formal revision before publication in the preliminary print of the United States Reports. Readers are requested to notify the Reporter of Decisions, Supreme Court of the United States, Washington, D. C. 20543, of any typographical or other formal errors, in order that corrections may be made before the preliminary print goes to press.

# SUPREME COURT OF THE UNITED STATES

No. 138, Orig.

## STATE OF SOUTH CAROLINA, PLAINTIFF *v.* STATE OF NORTH CAROLINA

### ON EXCEPTIONS TO THE REPORT OF THE SPECIAL MASTER

[January 20, 2010]

JUSTICE ALITO delivered the opinion of the Court.

The State of South Carolina brought this original action against the State of North Carolina, seeking an equitable apportionment of the Catawba River. We appointed a Special Master and referred the matter to her, together with the motions of three nonstate entities seeking to intervene in the dispute as parties. South Carolina opposed the motions. After holding a hearing, the Special Master granted the motions and, upon South Carolina's request, memorialized the reasons for her decision in a First Interim Report. South Carolina then presented exceptions, and we set the matter for argument.

Two of the three proposed intervenors have satisfied the standard for intervention in original actions that we articulated nearly 60 years ago in *New Jersey* v. *New York*, 345 U. S. 369 (1953) *(per curiam).* Accordingly, we overrule South Carolina's exceptions with respect to the Catawba River Water Supply Project (hereinafter CRWSP) and Duke Energy Carolinas, LLC (hereinafter Duke Energy), but we sustain South Carolina's exception with respect to the city of Charlotte, North Carolina (hereinafter Charlotte).

I

A

We granted leave for South Carolina to file its complaint in this matter two years ago. *South Carolina* v. *North Carolina*, 552 U. S. 804 (2007). The gravamen of the complaint is that North Carolina has authorized upstream transfers of water from the Catawba River basin that exceed North Carolina's equitable share of the river. It has done so, according to the complaint, pursuant to a North Carolina statute that requires any person seeking to transfer more than 2 million gallons of water per day (mgd) from the Catawba River basin to obtain a permit from the North Carolina Environmental Management Commission. See N. C. Gen. Stat. Ann. §143–215.22L(a)(1) (Lexis 2007); §143–215.22G(1)(h). Through that agency, the complaint alleges, North Carolina has issued at least two such permits, one to Charlotte for the transfer of up to 33 mgd, and one to the North Carolina cities of Concord and Kannapolis for the transfer of 10 mgd. In addition, the complaint alleges, North Carolina's permitting statute "grandfathers" a 5 mgd transfer by the CRWSP, and "implicitly authorize[s]" an unknown number of transfers of less than 2 mgd. Complaint ¶¶18, 21, 22. South Carolina claims that the net effect of these upstream transfers is to deprive South Carolina of its equitable share of the Catawba River's water, particularly during periods of drought or low river flow.

South Carolina seeks relief in the form of a decree that equitably apportions the Catawba River between the two States, enjoins North Carolina from authorizing transfers of water from the Catawba River exceeding that State's equitable share, and declares North Carolina's permitting statute invalid to the extent it is used to authorize transfers of water from the Catawba River that exceed North Carolina's equitable share. See generally Complaint, Prayer for Relief ¶¶1–3. The complaint does not specify a

minimum flow of water that would satisfy South Carolina's equitable needs, but it does offer a point of reference. In a recent "multi-stakeholder negotiation process" involving the Federal Energy Regulatory Commission (hereinafter FERC), Duke Energy, and various groups from both States, it was agreed, according to the complaint, that South Carolina should receive from the Catawba River a continuous flow of water of no less than 1,100 cubic feet per second, or about 711 mgd. Complaint ¶14.

This negotiated figure may prove unattainable. According to the complaint, natural conditions and periodic fluctuations have caused the Catawba River's flow to fall below 1,100 cubic feet per second. Duke Energy, which generates hydroelectric power from a series of reservoirs on the Catawba River, developed a model to estimate the river's flow if the river were not impounded. *Id.,* ¶¶8, 16. The complaint notes that according to Duke Energy's model, the Catawba River—even in its natural state— often would not deliver into South Carolina a minimum average daily flow of 1,100 cubic feet per second. *Id.,* ¶16; App. to Motion of State of South Carolina for Leave to File Complaint, Complaint, and Brief in Support of its Motion for Leave to File Complaint 18. South Carolina contends that North Carolina's authorization of large transfers of water from the Catawba River basin has exacerbated these conditions.

Shortly after we granted leave to file the complaint, two of the entities named in the complaint—the CRWSP and Duke Energy—filed motions for leave to intervene as parties. The CRWSP sought leave to intervene as a party-defendant, asserting its interest as a "riparian user of the Catawba River" and claiming that this interest was not adequately represented because of the CRWSP's "interstate nature." Motion of Catawba River Water Supply Project for Leave to Intervene and Brief in Support of Motion 8, 9. Specifically, the CRWSP noted that it is a

bistate entity that is jointly owned and regulated by, and supplies water to, North Carolina's Union County and South Carolina's Lancaster County. *Id.,* at 9. Duke Energy sought leave to intervene and file an answer, asserting an interest as the operator of 11 dams and reservoirs on the Catawba River that control the river's flow, as the holder of a 50-year license[1] governing Duke Energy's hydroelectric power operations, and as the entity that orchestrated the multistakeholder negotiation process culminating in a Comprehensive Relicensing Agreement (CRA) signed by 70 entities from both States in 2006. Duke Energy Carolinas, LLC's Motion and Brief in Support of Motion to Intervene and File Answer, and Answer 2, 5. This CRA set forth the terms under which Duke Energy has applied to renew its FERC license, *id.,* at 5, and Duke Energy asserted that neither State would represent its "particular amalgam of federal, state and private interests," *id.,* at 14. South Carolina opposed both motions, and we referred them to the Special Master. 552 U. S. 1160 (2008).

One month later, a third entity named in the complaint, the city of Charlotte, also sought leave to intervene as a party-defendant. In its brief, Charlotte asserted an interest, both as the holder of a permit authorizing the transfer of 33 mgd from the Catawba River basin—the largest single transfer identified in the complaint—and as the potential source of the 10 mgd transfer approved for the cities of Concord and Kannapolis. Motion for Leave to Intervene of City of Charlotte, North Carolina, and Brief in Support of Motion 5, 7.[2] Charlotte argued that North

---

[1] The license was issued in 1958 to Duke Energy's predecessor by the Federal Power Commission, a predecessor of the FERC. For convenience, we will refer to Duke Energy's "FERC license" herein.

[2] Charlotte also asserted an interest in protecting the terms of the CRA, to which Charlotte was a signatory but to which North Carolina, which has conflicting duties under §401 of the Clean Water Act, 86

Carolina could not represent the city's interests effectively because the State was duty bound to represent the interests of all North Carolina users of the Catawba River's water, including users whose interests were not aligned with Charlotte's. *Id.,* at 17. South Carolina also opposed Charlotte's motion, and we referred it to the Special Master. 552 U. S. 1254 (2008).

B

The Special Master held a hearing and issued an order granting all three motions for leave to intervene. At South Carolina's request, the Special Master set forth her findings and decision as a First Interim Report, and it is this Report to which South Carolina now presents exceptions.

The Special Master recognized that this Court has exercised jurisdiction over nonstate parties in original actions between two or more States. She also recognized that in *New Jersey* v. *New York*, 345 U. S. 369, the Court considered the "appropriate standard" for a nonstate entity's motion to intervene in an original action. First Interim Report of Special Master, O. T. 2008, No. 138, Orig., p. 12 (First Interim Rept.). But in attempting to give context to our standard, she looked beyond intervention and considered original actions in which the Court has allowed nonstate entities to be named as defendants by the complaining State. From those examples, the Special Master "distilled the following rule" governing motions to intervene in original actions by nonstate entities:

> "Although the Court's original jurisdiction presumptively is reserved for disputes between sovereign

————————

Stat. 877, as added, 33 U. S. C. §1341, was not. North Carolina opposed this argument, and the Special Master did not rely on it in recommending that Charlotte's motion to intervene should be granted. As Charlotte does not reassert this argument here, we do not consider it.

states over sovereign matters, nonstate entities may become parties to such original disputes in appropriate and compelling circumstances, such as where the nonstate entity is the instrumentality authorized to carry out the wrongful conduct or injury for which the complaining state seeks relief, where the nonstate entity has an independent property interest that is directly implicated by the original dispute or is a substantial factor in the dispute, where the nonstate entity otherwise has a 'direct stake' in the outcome of the action within the meaning of the Court's cases discussed above, or where, together with one or more of the above circumstances, the presence of the nonstate entity would advance the 'full exposition' of the issues." *Id.,* at 20–21.

Applying this broad rule, the Special Master found that each proposed intervenor had a sufficiently compelling interest to justify intervention. The Special Master rejected South Carolina's proposal to limit intervention to the remedy phase of this litigation and recommended that this Court grant the motions to intervene.

## II

## A

Participation by nonstate parties in actions arising under our original jurisdiction is not a new development. Article III, §2, of the Constitution expressly contemplates suits "between a State and Citizens of another State" as falling within our original jurisdiction, see, *e.g., Georgia* v. *Brailsford*, 2 Dall. 402 (1792), and for more than two centuries the Court has exercised that jurisdiction over nonstate parties in suits between two or more States, see *New York* v. *Connecticut*, 4 Dall. 1 (1799); *Missouri* v. *Illinois*, 180 U. S. 208, 224–225 (1901). Nonstate entities have even participated as parties in disputes between States, such as the one before us now, where the States

were seeking equitable apportionment of water resources. See, *e.g., Arizona* v. *California*, 460 U. S. 605, 608, n. 1 (1983); *Texas* v. *New Mexico*, 343 U. S. 932 (1952); *New Jersey* v. *City of New York*, 279 U. S. 823 (1929) *(per curiam).* It is, thus, not a novel proposition to accord party status to a citizen in an original action between States.

This Court likewise has granted leave, under appropriate circumstances, for nonstate entities to intervene as parties in original actions between States for nearly 90 years. See *Maryland* v. *Louisiana*, 451 U. S. 725, 745, n. 21 (1981). In *Oklahoma* v. *Texas*, 258 U. S. 574, 581, 598 (1922), a boundary dispute that threatened to erupt in armed hostilities, the Court allowed individual and corporate citizens to intervene to protect their rights in contested land. See, *e.g., Oklahoma* v. *Texas*, 254 U. S. 609 (1920).[3] More recently, the Court has allowed a municipality to intervene in a sovereign boundary dispute, see *Texas* v. *Louisiana*, 426 U. S. 465, 466 (1976) *(per curiam)*, and has permitted private corporations to intervene in an original action challenging a State's imposition of a tax that burdened interstate commerce and contravened the Supremacy Clause, see *Maryland* v. *Louisiana*, *supra,* at 745, n. 21.

In this case, the Special Master crafted a rule of intervention that accounts for the full compass of our precedents. But a compelling reason for allowing citizens to participate in one original action is not necessarily a compelling reason for allowing citizens to intervene in all

———————

[3] THE CHIEF JUSTICE argues against drawing conclusions from the intervention that we allowed in *Oklahoma* v. *Texas*, 254 U. S. 609 (1920). See *post*, at 7–8 (opinion concurring in judgment in part and dissenting in part). But the circumstances surrounding that dispute fit the "'model case'" for invoking this Court's original jurisdiction, *post*, at 2, and counsel against inferring from our precedents, as THE CHIEF JUSTICE does with respect to equitable apportionment actions, a rule against nonstate intervention in such "weighty controversies," *ibid.*

original actions. We therefore decline to adopt the Special Master's proposed rule. As the Special Master acknowledged, the Court in *New Jersey* v. *New York*, *supra,* set down the "appropriate standard" for intervention in original actions by nonstate entities. First Interim Rept. 12. We believe the standard that we applied in that case applies equally well here.[4]

In 1929, the State of New Jersey sued the State of New York and city of New York for their diversion of the Delaware River's headwaters. 345 U. S., at 370. The Court granted the Commonwealth of Pennsylvania leave to intervene, and in 1931, entered a decree enjoining certain diversions of water by the State of New York and the city of New York. *Id.,* at 371. In 1952, the city of New York moved to modify the decree, and New Jersey and Pennsylvania filed oppositions. After the Court referred the matter to a special master, the city of Philadelphia sought leave to intervene on the basis of its use of the Delaware River's water. *Id.,* at 371–372.

This Court denied Philadelphia leave to intervene. Pennsylvania had intervened *pro interesse suo* "to protect the rights and interests of Philadelphia and Eastern Pennsylvania in the Delaware River." *Id.,* at 374; see also *New Jersey* v. *New York*, 283 U. S. 336, 342 (1931). In view of Pennsylvania's participation, the Court wrote that when a State is "a party to a suit involving a matter of sovereign interest," it is *parens patriae* and "'must be deemed to represent all [of] its citizens.'" 345 U. S., at 372–373 (quoting *Kentucky* v. *Indiana*, 281 U. S. 163, 173–

———————

[4] Accordingly, we need not decide South Carolina's first exception to the Special Master's conclusion that intervention is proper "whenever the movant is the 'instrumentality' authorized to engage in conduct alleged to harm the plaintiff State, has an 'independent property interest' at issue in the action, or otherwise has a 'direct stake' in the outcome of the action." Exceptions of State of South Carolina to First Interim Report of Special Master and Brief in Support of Exceptions i.

174 (1930)). This principle serves the twin purposes of ensuring that due respect is given to "sovereign dignity" and providing "a working rule for good judicial administration." 345 U. S., at 373. The Court, thus, set forth the following standard governing intervention in an original action by a nonstate entity:

> "An intervenor whose state is already a party should have the burden of showing some compelling interest in his own right, apart from his interest in a class with all other citizens and creatures of the state, which interest is not properly represented by the state." *Ibid.*

On several subsequent occasions the Court has reaffirmed this "general rule." See *Nebraska* v. *Wyoming*, 515 U. S. 1, 21–22 (1995); *United States* v. *Nevada*, 412 U. S. 534, 538 (1973) *(per curiam); Illinois* v. *Milwaukee*, 406 U. S. 91, 97 (1972).

We acknowledge that the standard for intervention in original actions by nonstate entities is high—and appropriately so. Such actions tax the limited resources of this Court by requiring us "awkwardly to play the role of factfinder" and diverting our attention from our "primary responsibility as an appellate tribunal." *Ohio* v. *Wyandotte Chemicals Corp.*, 401 U. S. 493, 498 (1971); *Maryland* v. *Louisiana*, 451 U. S. 725, 762 (1981) (Rehnquist, J., dissenting). In order to ensure that original actions do not assume the "dimensions of ordinary class actions," *New Jersey* v. *New York*, 345 U. S., at 373, we exercise our original jurisdiction "sparingly" and retain "substantial discretion" to decide whether a particular claim requires "an original forum in this Court," *Mississippi* v. *Louisiana*, 506 U. S. 73, 76 (1992) (internal quotation marks omitted).

Respect for state sovereignty also calls for a high threshold to intervention by nonstate parties in a sovereign dispute committed to this Court's original jurisdic-

tion. Under 28 U. S. C. §1251, this Court exercises "original and exclusive" jurisdiction to resolve controversies between States that, if arising among independent nations, "would be settled by treaty or by force." *Kansas* v. *Colorado*, 206 U. S. 46, 98 (1907). This Court has described its original jurisdiction as "delicate and grave," *Louisiana* v. *Texas*, 176 U. S. 1, 15 (1900), and has guarded against its use as a forum in which "a state might be judicially impeached on matters of policy by its own subjects," *New Jersey* v. *New York*, 345 U. S., at 373. In its sovereign capacity, a State represents the interests of its citizens in an original action, the disposition of which binds the citizens. *Nebraska* v. *Wyoming, supra,* at 22; *New Jersey* v. *New York*, 345 U. S., at 372–373. A respect for sovereign dignity, therefore, counsels in favor of restraint in allowing nonstate entities to intervene in such disputes. See *ibid.;* accord, *United States* v. *Texas*, 143 U. S. 621, 643 (1892) ("[E]xclusive jurisdiction was given to this court, because it best comported with the dignity of a State, that a case in which it was a party should be determined in the highest, rather than in a subordinate judicial tribunal of the nation").[5]

That the standard for intervention in original actions by nonstate entities is high, however, does not mean that it is insurmountable. Indeed, as the Special Master correctly recognized, our practice long has been to allow such intervention in compelling circumstances. See *Oklahoma* v.

--------

[5] South Carolina has not invoked the Eleventh Amendment as a basis for opposing intervention. It has noted, however, that the proposed intervenors' claims are, in effect, against South Carolina, and thus has reserved the right to argue that the Eleventh Amendment bars particular forms of relief sought by the proposed intervenors. As in *New Jersey* v. *New York*, 345 U. S. 369, 372 (1953) *(per curiam)*, we express no view whether the Eleventh Amendment is implicated where a nonstate entity seeks to intervene as a defendant in an original action over a State's objection.

*Texas*, 258 U. S., at 581. Over the "strong objections" of three States, for example, the Court allowed Indian tribes to intervene in a sovereign dispute concerning the equitable apportionment of the Colorado River. *Arizona* v. *California*, 460 U. S., at 613. The Court did so notwithstanding the Tribes' simultaneous representation by the United States. *Id.,* at 608–609, 612. And in a boundary dispute among Texas, Louisiana, and the United States, the Court allowed the city of Port Arthur, Texas, to intervene for the purpose of protecting its interests in islands in which the United States claimed title. *Texas* v. *Louisiana*, 426 U. S., at 466; *Texas* v. *Louisiana*, 416 U. S. 965 (1974). In both of these examples, the Court found compelling interests that warranted allowing nonstate entities to intervene in original actions in which the intervenors were nominally represented by sovereign parties.

## B

### 1

Applying the standard of *New Jersey* v. *New York*, *supra,* here, we conclude that the CRWSP has demonstrated a sufficiently compelling interest that is unlike the interests of other citizens of the States. The CRWSP is an unusual municipal entity, established as a joint venture with the encouragement of regulatory authorities in both States and designed to serve the increasing water needs of Union County, North Carolina, and Lancaster County, South Carolina. It has an advisory board consisting of representatives from both counties, draws its revenues from its bistate sales, and operates infrastructure and assets that are owned by both counties as tenants-in-common. We are told that approximately 100,000 individuals in each State receive their water from the CRWSP and that "roughly half" of the CRWSP's total withdrawals of water from the Catawba River go to South Carolina consumers. Reply of Catawba River Water Supply Project

to Exceptions of South Carolina to First Interim Report of Special Master 22 (hereinafter CRWSP Reply). It is difficult to conceive of a more purely bistate entity.

In addition, the CRWSP relies upon authority granted by both States to draw water from the Catawba River and transfer that water from the Catawba River basin. The CRWSP draws all of its water from an intake located below the Lake Wylie dam in South Carolina. South Carolina licensed the CRWSP to withdraw a total of 100 mgd from the Catawba River and issued a certificate to the CRWSP in 1989 authorizing up to 20 mgd to be transferred out of the Catawba River basin. *Id.,* at 6–7; Answer to Bill of Complaint ¶21. Lancaster County currently uses approximately 2 mgd of this amount, Union County uses approximately 5 mgd, and the remaining 13 mgd are not used at this time. CRWSP Reply 7. The CRWSP pumps Union County's allocation across the state border pursuant to a parallel certificate issued by North Carolina authorizing a 5 mgd transfer, *ibid.*, and the complaint specifically identifies this transfer as contributing to South Carolina's harm, Complaint ¶21. Thus, the CRWSP's activities depend upon authority conferred by both States.

On these facts, we think it is clear that the CRWSP has carried its burden of showing a compelling interest in the outcome of this litigation that distinguishes the CRWSP from all other citizens of the party States. See *New Jersey* v. *New York, supra,* at 373. Apart from its interest as a user of the Catawba River's water, the CRWSP has made a $30 million investment in its plant and infrastructure, with each participating county incurring approximately half of this cost as debt. Each county is responsible for one-half of the CRWSP's cost of operations, and the venture is designed to break even from year to year. Any disruption to the CRWSP's operations would increase—not lessen—the difficulty of our task in achieving a "just and

equitable" allocation in this dispute. See *Nebraska* v. *Wyoming*, 325 U. S. 589, 618 (1945). We believe that the CRWSP has shown a compelling interest in protecting the viability of its operations, which are premised on a fine balance between the joint venture's two participating counties.

We are further persuaded that neither State can properly represent the interests of the CRWSP in this litigation. See *New Jersey* v. *New York*, 345 U. S., at 373. The complaint attributes a portion of the total water transfers that have harmed South Carolina to the CRWSP, yet North Carolina expressly states that it "cannot represent the interests of the joint venture." Tr. of Oral Arg. 54. A moment's reflection reveals why this is so. In this dispute, as in all disputes over limited resources, each State maximizes its equitable share of the Catawba River's water only by arguing that the other State's equitable share must be reduced. See, *e.g., Colorado* v. *New Mexico*, 459 U. S. 176, 186–187 (1982). It is thus likely that North Carolina, in response to South Carolina's demand for a greater share of the Catawba River's water, will take the position that downstream users—such as Lancaster County[6]—should receive less water. See Tr. of Oral Arg. 52 ("From North Carolina's perspective, South Carolina is receiving much more water under this negotiated agreement than they could ever hope to achieve in an equitable apportionment action"). The stresses that this litigation would place upon the CRWSP threaten to upset the fine balance on which the joint venture is premised, and nei-

---

[6] As a further complication, we are told, Lancaster County has an obligation to provide water service to certain customers in Mecklenburg County, North Carolina. CRWSP Reply 6. Thus, South Carolina may not be interested in protecting all uses of Lancaster County's share of the CRWSP's water. This additional intermingling of state interests further supports our conclusion that neither State adequately represents the CRWSP's inherently bistate interests.

ther State has sufficient interest in maintaining that balance to represent the full scope of the CRWSP's interests.

Accordingly, we believe that the CRWSP should be allowed to intervene to represent its own compelling interests in this litigation. We thus overrule South Carolina's exception.

2

We conclude, as well, that Duke Energy has demonstrated powerful interests that likely will shape the outcome of this litigation. To place these interests in context, it is instructive to consider the "flexible" process by which we arrive at a "'just and equitable apportionment'" of an interstate stream. *Colorado* v. *New Mexico*, *supra,* at 183. We do not approach the task in formulaic fashion, *New Jersey* v. *New York*, 283 U. S., at 343, but we consider "all relevant factors," including, but not limited to:

> "'physical and climatic conditions, the consumptive use of water in the several sections of the river, the character and rate of return flows, the extent of established uses, the availability of storage water, the practical effect of wasteful uses on downstream areas, [and] the damage to upstream areas as compared to the benefits to downstream areas if a limitation is imposed on the former.'" *Colorado* v. *New Mexico*, *supra,* at 183 (quoting *Nebraska* v. *Wyoming*, *supra,* at 618).

In performing this task, there is no substitute for "'the exercise of an informed judgment,'" *Colorado* v. *New Mexico, supra,* at 183, and we will not hesitate to seek out the most relevant information from the source best situated to provide it. See *Maryland* v. *Louisiana*, 451 U. S., at 745, n. 21 (allowing intervention of private pipeline companies "in the interest of a full exposition of the

issues").

With these considerations in mind, we turn to Duke Energy's asserted interests. Duke Energy operates 11 dams and reservoirs in both States that generate electricity for the region and control the flow of the river. The complaint itself acknowledges the relationship between river flow and Duke Energy's operations, noting that a severe drought that ended in 2002 forced Duke Energy to "reduce dramatically" its hydroelectric power generation from the Catawba River. Complaint ¶17(c). It is likely that any equitable apportionment of the river will need to take into account the amount of water that Duke Energy needs to sustain its operations and provide electricity to the region, thus giving Duke Energy a strong interest in the outcome of this litigation. See *Colorado* v. *New Mexico*, *supra,* at 188 (noting the appropriateness of considering "the balance of harm and benefit that might result" from a State's proposed diversion of a river). There is, moreover, no other similarly situated entity on the Catawba River, setting Duke's interests apart from the class of all other citizens of the States. See *New Jersey* v. *New York*, *supra,* at 373.

Just as important, Duke Energy has a unique and compelling interest in protecting the terms of its existing FERC license and the CRA that forms the basis of Duke Energy's pending renewal application.[7] Through its dams, Duke Energy controls the flow of the Catawba River under the terms of its 50-year FERC license, which regulates the very subject matter in dispute: the river's minimum flow into South Carolina. See Order Issuing License (Major), *Duke Power Co., Project No. 2232*, 20 F. P. C. 360, 371–372 (1958) (Articles 31 and 32). The CRA, likewise, represents

_____

[7] Duke Energy is operating under a temporary extension of its 50-year FERC license, which expired in 2008, and the CRA represents Duke Energy's investment in a new 50-year license.

the full consensus of 70 parties from both States regarding the appropriate minimum continuous flow of Catawba River water into South Carolina under a variety of natural conditions and, in times of drought, the conservation measures to be taken by entities that withdraw water from the Catawba River. These factors undeniably are relevant to any "just and equitable apportionment" of the Catawba River, see *Colorado* v. *New Mexico*, 459 U. S., at 183, and we are likely to consider them in reaching our ultimate disposition of this case. Thus, we find that Duke Energy has carried its burden of showing unique and compelling interests.

We also have little difficulty in concluding that neither State sufficiently represents these compelling interests. Neither State has signed the CRA or expressed an intention to defend its terms. To the contrary, North Carolina has expressed an intention to seek its modification. Tr. of Oral Arg. 51–52. Given the importance of Duke Energy's interests and their relevance to our ultimate decision, we believe these interests should be represented by a party in this action, and we find that neither State is situated to do so properly. We believe that Duke Energy should be permitted to represent its own interests.

For these reasons, we agree with the Special Master that Duke Energy should be permitted to intervene, and we overrule South Carolina's exception in that regard.

3

We conclude, however, that Charlotte has not carried its burden of showing a sufficient interest for intervention in this action. Charlotte is a municipality of North Carolina, and for purposes of this litigation, its transfers of water from the Catawba River basin constitute part of North Carolina's equitable share. While it is true that the complaint names Charlotte as an entity authorized by North Carolina to carry out a large transfer of water from the

Catawba River basin, the complaint does not seek relief against Charlotte directly. Rather, the complaint seeks relief against all North Carolina-authorized transfers of water from the Catawba River basin, "past or future," in excess of North Carolina's equitable share. Complaint, Prayer for Relief ¶2. Charlotte, therefore, occupies a class of affected North Carolina users of water, and the magnitude of Charlotte's authorized transfer does not distinguish it in kind from other members of the class. See *New Jersey* v. *New York*, 345 U. S., at 373, and n. (noting that Philadelphia represented half of the Pennsylvania's citizens in the watershed). Nor does Charlotte represent interstate interests that fall on both sides of this dispute, as the CRWSP does, such that the viability of Charlotte's operations in the face of this litigation is called into question. Its interest is solely as a user of North Carolina's share of the Catawba River's water.

Charlotte's interest falls squarely within the category of interests with respect to which a State must be deemed to represent all of its citizens. As we recognized in *New Jersey* v. *New York*, a State's sovereign interest in ensuring an equitable share of an interstate river's water is precisely the type of interest that the State, as *parens patrie*, represents on behalf of its citizens. See also *United States* v. *Nevada*, 412 U. S., at 539; *Nebraska* v. *Wyoming*, 325 U. S., at 616. That is why, in *New Jersey* v. *New York*, *supra,* we required that a proposed intervenor show a compelling interest "in his own right," distinct from the collective interest of "all other citizens and creatures of the state," whose interest the State presumptively represents in matters of sovereign policy. *Id.,* at 373. We conclude that Charlotte has not carried that burden. Thus, respect for "sovereign dignity" requires us to recognize that North Carolina properly represents Charlotte in this dispute over a matter of uniquely sovereign interest. See *ibid.*

North Carolina's own statements only reinforce this

conclusion. North Carolina has said that it will defend Charlotte's authorized 33 mgd transfer. Tr. of Oral Arg. 52–53. The State expressly disagrees with Charlotte's assertion that the city's interest is not adequately represented by the State. Brief of State of North Carolina in Opposition to Plaintiff's Exceptions 22. Indeed, in response to Charlotte's motion to intervene, North Carolina wrote the following:

> "[T]he State must represent the interests of every person that uses water from the North Carolina portion of the Catawba River basin. In fact, the State has a particular concern for its political subdivisions, such as Charlotte, which actually operate the infrastructure to provide water to the State's citizens. . . . The State has every reason to defend the [transfers] that it has authorized for the benefit of its citizens. The State cannot agree with any implication that because it represents all of the users of water in North Carolina it cannot, or will not represent the interests of Charlotte in this litigation initiated by South Carolina." Brief for State of North Carolina in Response to City of Charlotte's Motion for Leave to Intervene and File Answer 1–2.

These statements are consistent with North Carolina's role as *parens patriae*, and we see no reason that North Carolina cannot represent Charlotte's interest in this sovereign dispute. See *New Jersey* v. *New York, supra,* at 374 (noting that Philadelphia's interest "is invariably served by the Commonwealth's position").

Because we are not persuaded that Charlotte's interest is sufficiently unique and not properly represented by North Carolina to require the city's intervention as a party in this litigation, we sustain South Carolina's exception.[8]

---

[8] Federal Rule of Civil Procedure 24 does not require a contrary re-

## III

We thus overrule South Carolina's exceptions to the Special Master's First Interim Report with respect to the CRWSP and Duke Energy, but we sustain South Carolina's exception with respect to Charlotte.

*It is so ordered.*

———————

sult. This Court's Rule 17.2 allows the Federal Rules of Civil Procedure to be taken as "guides" to procedure in original actions. See *Arizona* v. *California*, 460 U. S. 605, 614 (1983). Even if we were to look to the standard for intervention of right in civil matters, Charlotte would not be entitled to intervene in this dispute because an existing party— North Carolina—adequately represents Charlotte's interest. See Fed. Rule Civ. Proc. 24(a)(2). To the extent that the standard for permissive intervention may be an appropriate guide when a movant presents a sufficiently "important but ancillary concern," see *Arizona, supra,* at 614–616, we find no such concern here. North Carolina's adequate representation of Charlotte and the heightened standard for intervention in original actions, see *New Jersey* v. *New York*, 345 U. S., at 373, persuade us not to apply the standard for permissive intervention set forth in Federal Rule of Civil Procedure 24(b)(1)(B).

# SUPREME COURT OF THE UNITED STATES

No. 138, Orig.

## STATE OF SOUTH CAROLINA, PLAINTIFF *v.* STATE OF NORTH CAROLINA

ON EXCEPTIONS TO THE REPORT OF THE SPECIAL MASTER

[January 20, 2010]

CHIEF JUSTICE ROBERTS, with whom JUSTICE THOMAS, JUSTICE GINSBURG, and JUSTICE SOTOMAYOR join, concurring in the judgment in part and dissenting in part.

The Court correctly rejects the Special Master's formulation of a new test for intervention in original actions, and correctly denies the city of Charlotte leave to intervene. The majority goes on, however, to misapply our established test in granting intervention to Duke Energy Carolinas, LLC (Duke Energy), and the Catawba River Water Supply Project (CRWSP).

The result is literally unprecedented: Even though equitable apportionment actions are a significant part of our original docket, this Court has never before granted intervention in such a case to an entity other than a State, the United States, or an Indian tribe. Never. That is because the apportionment of an interstate waterway is a sovereign dispute, and the key to intervention in such an action is just that—sovereignty. The Court's decision to permit nonsovereigns to intervene in this case has the potential to alter in a fundamental way the nature of our original jurisdiction, transforming it from a means of resolving high disputes between sovereigns into a forum for airing private interests. Given the importance of maintaining the proper limits on that jurisdiction, I respectfully dissent.

## I

Two basic principles have guided the exercise of our constitutionally conferred original jurisdiction. The first is an appreciation that our original jurisdiction, "delicate and grave," *Louisiana* v. *Texas*, 176 U. S. 1, 15 (1900), was granted to provide a forum for the peaceful resolution of weighty controversies involving the States. "The model case for invocation of this Court's original jurisdiction is a dispute between States of such seriousness that it would amount to *casus belli* if the States were fully sovereign." *Texas* v. *New Mexico*, 462 U. S. 554, 571, n. 18 (1983). In determining whether to exercise original jurisdiction, we accordingly focus on "the nature of the interest of the complaining State," and in particular the "seriousness and dignity" of the claim asserted. *Mississippi* v. *Louisiana*, 506 U. S. 73, 77 (1992) (internal quotation marks omitted).

Original jurisdiction is for the resolution of *state* claims, not private claims. To invoke that jurisdiction, a State "must, of course, represent an interest of her own and not merely that of her citizens or corporations." *Arkansas* v. *Texas*, 346 U. S. 368, 370 (1953); see *Kansas* v. *Colorado*, 533 U. S. 1, 8–9 (2001); *Pennsylvania* v. *New Jersey*, 426 U. S. 660, 665 (1976) (*per curiam*) (It is "settled doctrine that a State has standing to sue only when its sovereign or quasi-sovereign interests are implicated and it is not merely litigating as a volunteer the personal claims of its citizens"). And in deciding whether a State meets that requirement, this Court considers whether the State is "in full control of [the] litigation." *Kansas* v. *Colorado*, *supra*, at 8.

The second guiding principle is a practical one: We are not well suited to assume the role of a trial judge. See *Ohio* v. *Wyandotte Chemicals Corp.*, 401 U. S. 493, 498 (1971). We have attempted to address that reality by relying on the services of able special masters, who have become vitally important in allowing us to manage our

original docket.  But the responsibility for the exercise of this Court's original jurisdiction remains ours alone under the Constitution.

These two considerations—that our original jurisdiction is limited to high claims affecting state sovereignty, and that practical realities limit our ability to act as a trial court—converge in our standard for intervention in original actions.  We articulated that standard in *New Jersey* v. *New York*, 345 U. S. 369, 373 (1953) (*per curiam*).  There, we denied the city of Philadelphia's motion for leave to intervene in an action, to which the Commonwealth of Pennsylvania was already a party, involving the apportionment of the Delaware River.  *Id.*, at 373–374.  We set out the following test for intervention in an original action: "An intervenor whose state is already a party should have the burden of showing some compelling interest in his own right, apart from his interest in a class with all other citizens and creatures of the state, which interest is not properly represented by the state."  *Id.*, at 373.

This exacting standard is grounded on a "necessary recognition of sovereign dignity," *id.,* at 373, under which "the state, when a party to a suit involving a matter of sovereign interest, 'must be deemed to represent all its citizens,'" *id.*, at 372 (quoting *Kentucky* v. *Indiana*, 281 U. S. 163, 173–174 (1930)).  In applying that doctrine to motions to intervene, the *New Jersey* v. *New York* test precludes a State from being "judicially impeached on matters of policy by its own subjects," and prevents the use of the Court's original jurisdiction to air "intramural dispute[s]" that should be settled in a different forum— namely, within the States.  345 U. S., at 373.

The *New Jersey* v. *New York* test is also "a working rule for good judicial administration."  *Ibid.*  Without it, "there would be no practical limitation on the number of citizens, as such, who would be entitled to be made parties."  *Ibid.*  Indeed, the Court observed that allowing Philadelphia to

intervene would have made it difficult to refuse attempts to intervene by other users of water from the Delaware River, including other cities, and even "[l]arge industrial plants." *Ibid.* The *New Jersey* v. *New York* test, properly applied, provides a much-needed limiting principle that prevents the expansion of our original proceedings "to the dimensions of ordinary class actions," *ibid.*, or "town-meeting lawsuits," *id.*, at 376 (Jackson, J., dissenting). See also *Ohio* v. *Wyandotte Chemicals Corp.*, *supra*, at 504; *Utah* v. *United States*, 394 U. S. 89, 95–96 (1969) (*per curiam*).

## II

Applying these principles, this Court has never granted a nonsovereign entity's motion to intervene in an equitable apportionment action. The reason is straightforward: An interest in water is an interest shared with other citizens, and is properly pressed or defended by the State. And a private entity's interest in its particular share of the State's water, once the water is allocated between the States, is an "intramural dispute" to be decided by each State on its own. *New Jersey* v. *New York*, *supra*, at 373.

The interests of a State's citizens in the use of water derive entirely from the State's sovereign interest in the waterway. If the State has no claim to the waters of an interstate river, then its citizens have none either. See *Hinderlider* v. *La Plata River & Cherry Creek Ditch Co.*, 304 U. S. 92, 102 (1938). We have long recognized, therefore, that the State must be deemed to represent its citizens' interests in an equitable apportionment action. See *United States* v. *Nevada*, 412 U. S. 534, 539 (1973) (*per curiam*) ("For the purposes of dividing the waters of an interstate stream with another State, [a State] has the right, *parens patriae*, to represent all the nonfederal users in its own State insofar as the share allocated to the other State is concerned"). Precisely because the State repre-

sents all its citizens in an equitable apportionment action, these citizens have no claim themselves against the other State. They are instead "bound by the result reached through representation by their respective States," regardless of whether those citizens are parties to the suit. *Nebraska* v. *Wyoming*, 515 U. S. 1, 22 (1995).

This basic principle applies without regard to whether the State agrees with and will advance the particular interest asserted by a specific private entity. The State "'must be deemed to represent *all* its citizens,'" *New Jersey* v. *New York*, *supra*, at 372 (quoting *Kentucky* v. *Indiana*, *supra*, at 173–174; emphasis added), not just those who subscribe to the State's position before this Court. The directive that a State cannot be "judicially impeached on matters of policy by its own subjects," *New Jersey* v. *New York*, *supra*, at 373, obviously applies to the case in which a subject disagrees with the position of the State.

A State's citizens also need not be made parties to an equitable apportionment action because the Court's judgment in such an action does not determine the water rights of any individual citizen. We made that clear long ago in two decisions arising from the same dispute, *Wyoming* v. *Colorado*, 298 U. S. 573 (1936), and *Wyoming* v. *Colorado*, 309 U. S. 572 (1940). In those cases, Wyoming sought to enforce this Court's earlier decree apportioning the Laramie River. See *Wyoming* v. *Colorado*, 260 U. S. 1 (1922). We held that the decree controlled the allocation of water between Wyoming and Colorado, not within them. As we recognized, our decision apportioning the river did not "withdraw water claims dealt with therein from the operation of local laws relating to their transfer or . . . restrict their utilization in ways not affecting the rights of one State and her claimants as against the other State and her claimants." 298 U. S., at 584. Thus, although the decree referred to particular uses of water in Colorado, we held that those individual uses could vary

from the terms set out in the decree, so long as the total diversion of water in Colorado was no greater than the decree allowed. See *id.,* at 584–585; 309 U. S., at 579–581. We reiterated the point in *Nebraska* v. *Wyoming*, 325 U. S. 589, 627 (1945), observing that the apportionment of a waterway between the States has only an "indirect effect" on the rights of individuals within the States.

All this explains our long history of rejecting attempts by nonsovereign entities to intervene in equitable apportionment actions. *New Jersey* v. *New York* was itself an equitable apportionment suit, and we denied intervention in that case. We have also summarily denied motions to intervene in other water disputes between the States. See *Arizona* v. *California*, 514 U. S. 1081 (1995); *Arizona* v. *California*, 345 U. S. 914 (1953); *Nebraska* v. *Wyoming*, 296 U. S. 548 (1935); *Wisconsin* v. *Illinois*, 279 U. S. 821 (1929). And we have strongly intimated in other decisions (albeit in dictum) that private entities can rarely, if ever, intervene in original actions involving the apportionment of interstate waterways. See *United States* v. *Nevada, supra*, at 538 ("[I]ndividual users of water . . . ordinarily would have no right to intervene in an original action in this Court"); *Nebraska* v. *Wyoming*, 515 U. S., at 22 ("We have said on many occasions that water disputes among States may be resolved by compact or decree without the participation of individual claimants").[1]

———————

[1] The majority contends that this dissent reads our precedents to establish "a rule against nonstate intervention" in equitable apportionment actions. *Ante*, at 7, n. 3. The number of nonsovereigns that the Court should permit to intervene in water disputes is small—indeed, it was zero until today. But that does not mean that a private entity could not satisfy the *New Jersey* v. *New York* test by, for example, asserting water-use rights that are not dependent upon the rights of state parties. A private party (or perhaps a Compact Clause entity) with a federal statutory right to a certain quantity of water might have a compelling interest in an equitable apportionment action that is not fairly represented by the States. The putative intervenors in this case,

The majority contends that the result in this case is not a "new development," and that its holding is supported by "nearly 90 years" of precedent. *Ante*, at 6–7. But in support of those statements, the majority cites only four decisions in which the Court has granted a motion to intervene in an original suit—and of course none in which this Court granted the motion of a nonsovereign entity to intervene in an equitable apportionment action. The cases the majority cites demonstrate what constitutes a "compelling interest in [the intervenor's] own right, apart from his interest in a class with all other citizens and creatures of the state." *New Jersey* v. *New York*, *supra*, at 373. But the intervenor interests in those cases were quite different from the general shared interest in water at issue here.

Take *Arizona* v. *California*, 460 U. S. 605 (1983). There we allowed several Indian Tribes to intervene in a water dispute. *Id.*, at 615. As the Court in that case made clear, however, the Indian Tribes were allowed to intervene because they were sovereign entities. *Ibid.* The Court distinguished *New Jersey* v. *New York* on that very ground. See 460 U. S., at 615, n. 5.

The other cases relied upon by the majority are even farther afield. See *Maryland* v. *Louisiana*, 451 U. S. 725 (1981); *Texas* v. *Louisiana*, 426 U. S. 465 (1976) (*per curiam*); *Oklahoma* v. *Texas*, 258 U. S. 574 (1922). None was an equitable apportionment action. Two involved boundary disputes in which the Court allowed nonsovereign intervenors to claim title to certain parcels of property. See *Texas* v. *Louisiana*, *supra*, at 466 (permitting intervention by the city of Port Arthur, Texas); *Oklahoma* v. *Texas*, *supra*, at 580–581 (same for private parties). A claim to title in a particular piece of property is quite different from a general interest shared by all citizens in the State's waters. And it would be particularly inapt to

————————

however, do not hold rights of this sort.

draw general conclusions about intervention from *Oklahoma* v. *Texas*, in which the Court took the southern half of the Red River into receivership. See 258 U. S., at 580. In subsequently allowing persons to intervene to assert claims to the subject property, the Court relied explicitly on the fact that the receiver had possession and control of the claimed parcels, and "no other court lawfully [could] interfere with or disturb that possession or control." *Id.*, at 581.

The majority's reliance on *Maryland* v. *Louisiana* is equally unavailing. There, several States challenged the constitutionality of Louisiana's application of a tax on natural gas that was brought into that State. 451 U. S., at 728. In two sentences within a long footnote, the Court mentioned that it was permitting a group of pipeline companies to intervene and challenge the tax. *Id.*, at 745, n. 21. The Court made clear that the pipeline companies were able to intervene in light of the particular circumstances in that case—namely, Louisiana's tax was "directly imposed on the owner of imported gas," and "the pipelines most often own[ed] the gas." *Ibid.* Again, an interest in a tax imposed only on discrete parties is obviously different from a general interest shared by all citizens of the State.

## III

Charlotte, Duke Energy, and CRWSP claim a variety of specific needs for water to justify their intervention. But all those particular needs derive from an interest in the water of the Catawba River. That interest is not exclusive, but is instead shared "with all other citizens and creatures of the state." *New Jersey* v. *New York*, 345 U. S., at 373. The State's "citizens and creatures" certainly put the Catawba's water and flow to different uses—many for drinking water, some for farming or recreation, others for generating power. That does not, however, make their

interest in the water itself unique. And it is the respective interests of the States in the water itself that are being litigated in this original action—not the claims of particular citizens that they be allowed to put the water to specified uses. The latter subject is "an intramural dispute over the distribution of water within the [State]," *ibid.*, and is not the subject of this original proceeding.

The majority recognizes as much with respect to Charlotte, *ante*, at 16–18, but departs from these principles in granting intervention to Duke Energy and CRWSP. The majority's reasons for doing so do not withstand scrutiny.

The majority initially contends that Duke Energy should be allowed to intervene because it possesses "relevant information" that we are "likely to consider." *Ante*, at 14, 16. Nonparties often do, but that is not a "compelling interest" justifying intervention. I have little doubt that Philadelphia possessed pertinent information in *New Jersey* v. *New York*, but we did not permit Philadelphia to intervene on that ground. Parties to litigation have ready means of access to relevant information held by nonparties, and those nonparties can certainly furnish such information on their own if they consider it in their best interests (through, for example, participation as *amici curiae*).

The majority also states that Duke Energy has compelling interests in its hydroelectric operations along the river, and in "the amount of water that Duke Energy needs to sustain its operations and provide electricity to the region." *Ante*, at 15. These are simply interests in a particular use of water or its flow. Even if Duke Energy uses water for particularly important purposes, its interests are no different in kind from the interests of any other entity that relies on water for its commercial operations.

Finally, the majority asserts that Duke Energy "has a unique and compelling interest in protecting the terms of its existing [Federal Energy Regulatory Commission

(FERC)] license and the [Comprehensive Licensing Agreement (CRA)] that forms the basis of Duke Energy's pending renewal application." *Ibid.* And the majority contends that neither State represents these interests because "[n]either State has signed the CRA or expressed an intention to defend its terms," and because North Carolina has even expressed its intent to challenge the terms of the CRA in this action. *Ante*, at 16.

Again, all this amounts to is an articulation of the *reason* Duke Energy asserts a particular interest in the waters of the Catawba. Other citizens of North Carolina doubtless have reasons of their own, ones they find as important as Duke Energy believes its to be. Weighing those interests is an "intramural" matter for the State. *New Jersey* v. *New York*, *supra*, at 373. In addition, the Federal Government is doubtless familiar with the pending FERC proceedings, and it sees no corresponding need for us to grant Duke Energy's motion to intervene. See Brief for United States as *Amicus Curiae* 20, n. 3.

As for CRWSP, the Special Master concluded that it should be allowed to intervene, but only because its position was "similar analytically to Charlotte's." First Interim Report of Special Master, O. T. 2008, No. 138, Orig., p. 25. The Court rejects Charlotte's motion, but nonetheless allows CRWSP to intervene on a ground not relied upon by the Special Master. According to the majority, CRWSP should be allowed to intervene because, as a bistate entity, its full range of interests cannot be represented entirely by either North or South Carolina. See *ante*, at 11–14.

CRWSP's motion arguably presents a different case from that of Duke Energy, one not definitively resolved by this Court in *New Jersey* v. *New York*. At the end of the day, however, I agree with the Special Master's premise— CRWSP's position is really no different from Charlotte's. I disagree with her conclusion, of course, because I agree

with the Court that Charlotte should not be allowed to intervene.

A bistate entity cannot be allowed to intervene merely because it embodies an "intermingling of state interests." *Ante*, at 13, n. 6. The same would be true of any bistate entity, or indeed any corporation or individual conducting business in both States. An exception for such cases would certainly swallow the *New Jersey* v. *New York* rule. Entities with interests in both States must seek to vindicate those interests within each State. Bistate entities are not States entitled to invoke our original jurisdiction, and should not be effectively accorded an automatic right to intervene as parties in cases within that jurisdiction.

With respect to both Duke Energy and CRWSP, the majority further relies on its conclusion that the States will not "properly represent" the interests of those entities. *Ante*, at 13; see *ante*, at 16. If by that the Court means that the States may adopt positions adverse to Duke Energy and CRWSP, that surely cannot be enough. The guiding principle articulated in *New Jersey* v. *New York* is "that the state, when a party to a suit involving a matter of sovereign interest, 'must be deemed to represent all its citizens,'" and may not be "judicially impeached on matters of policy by its own subjects." 345 U. S., at 372–373 (quoting *Kentucky* v. *Indiana*, 281 U. S., at 173–174). This case involves a "matter of sovereign interest"—the equitable apportionment of water—and the States therefore "properly represen[t]" the shared interests in water of "all" their citizens, including Duke Energy and CRWSP. 345 U. S., at 372–373. An interest is "not properly represented" by a State, *id.*, at 373, when it is not a sovereign interest but instead a parochial one, such as the interests held to justify intervention in the cases on which the majority relies. See *supra*, at 7–8.

The majority also pays little heed to the practical constraints on this Court's original jurisdiction. It is hard to

see how the arguments the Court accepts today could not also be pressed by countless other water users in either North or South Carolina. Under the Court's analysis, I see "no practical limitation on the number of citizens, as such, who would be entitled to be made parties." *New Jersey* v. *New York*, *supra*, at 373. To the extent intervention is allowed for some private entities with interests in the water, others who also have an interest will feel compelled to intervene as well—and we will be hard put to refuse them. See *Utah* v. *United States*, 394 U. S., at 95–96 (denying intervention to a corporation that sought to quiet its title to land because, "[i]f [it were] admitted, fairness would require the admission of any of the other 120 private landowners who wish to quiet their title . . . , greatly increasing the complexity of this litigation"). An equitable apportionment action will take on the characteristics of an interpleader case, with all those asserting interests in the limited supply of water jostling for their share like animals at a water hole. And we will find ourselves in a "quandary whereby we must opt either to pick and choose arbitrarily among similarly situated litigants or to devote truly enormous portions of our energies to [original] matters." *Ohio* v. *Wyandotte Chemicals Corp.*, 401 U. S., at 504.

Allowing nonsovereign entities to intervene as parties will inevitably prolong the resolution of this and other equitable apportionment actions, which already take considerable time. Intervenors do not come alone—they bring along more issues to decide, more discovery requests, more exceptions to the recommendations of the Special Master. In particular, intervention makes settling a case more difficult, as a private intervenor has the right to object to a settlement agreement between the States, if not the power to block a settlement altogether. Cf. *Firefighters* v. *Cleveland*, 478 U. S. 501, 529 (1986).

And all this for what? The Special Master, and through

her the Court, can have the benefit of the views of those seeking to intervene by according them the status of *amici curiae*. "Where he presents no new questions, a third party can contribute usually most effectively and always most expeditiously by a brief amicus curiae and not by intervention." *Bush* v. *Viterna*, 740 F. 2d 350, 359 (CA5 1984) (*per curiam*) (internal quotation marks omitted). Courts often treat *amicus* participation as an alternative to intervention. See 7C C. Wright, A. Miller, & M. Kane, Federal Practice and Procedure §1913, p. 495, and n. 26 (2007) (citing examples). And this Court often denies motions to intervene while granting leave to participate as an *amicus* in original actions generally, see, *e.g., Kentucky* v. *Indiana*, 445 U. S. 941 (1980); *United States* v. *California*, 377 U. S. 926 (1964); cf. *New Hampshire* v. *Maine*, 426 U. S. 363, 365, n. 2 (1976), and in equitable apportionment actions specifically, see, *e.g., Arizona* v. *California*, 530 U. S. 392, 419, n. 6 (2000); *Nebraska* v. *Wyoming*, 507 U. S. 584, 589–590 (1993).

*Nebraska* v. *Wyoming* is particularly instructive on this point. The Court there adopted the recommendation of the Special Master to deny intervention to certain entities. See *id.,* at 589–590; Second Interim Report of Special Master, O. T. 1991, No. 108, Orig., pp. 108–109. The interests of those entities in the water dispute were quite similar to the interests of the entities seeking to intervene here: One operated a powerplant and a reservoir on the Laramie River, and another was a power district seeking to protect its FERC license. See First Interim Report of Special Master, O. T. 1988, No. 108, Orig., pp. 11–14, 9a. While it adopted the Special Master's recommendation to deny intervention, the Court nonetheless permitted those entities to participate as *amici*. See 507 U. S., at 589–590; *Nebraska* v. *Wyoming*, 502 U. S. 1055 (1992).[2] The major-

---

[2] No party filed exceptions to the Special Master's recommendation to

ity does not explain why that familiar and customary approach might be inadequate in this case.

\*    \*    \*

Our original jurisdiction over actions between States is concerned with disputes so serious that they would be grounds for war if the States were truly sovereign. *Texas* v. *New Mexico*, 462 U. S., at 571, n. 18. A dispute between States over rights to water fits that bill; a squabble among private entities within a State over how to divvy up that State's share does not. A judgment in an equitable apportionment action binds the States; it is not binding with respect to particular uses asserted by private entities. Allowing intervention by such entities would vastly complicate and delay already complicated and lengthy actions. And the benefits private entities might bring can be readily secured, as has typically been done, by their participation as *amici curiae.*

In light of all this, it is difficult to understand why the Court grants nonsovereign entities leave to intervene in this equitable apportionment action, and easy to understand why the Court has never before done so in such a case.

I would grant South Carolina's exceptions, and deny the motions to intervene.

—————

deny intervention in *Nebraska* v. *Wyoming.* The Special Master later allowed one of the entities, Basin Electric Power Cooperative, to intervene as a party based on changed circumstances. See Addendum to Reply Brief for Duke Energy 2–5. That decision was never reviewed by the Court.